**Jake LAPIN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 81–0213.**

United States District Court, D. Hawaii.

Oct. 19, 1987.

---

**2.** Mr. Jackson has not filed an appearance in this case, so it is not known what was intended by his use of the word "defend."

Jake Lapin, pro se.

Daniel A. Bent, U.S. Atty., Honolulu (Hawaii), Stephen G. Fuerth, David Bunning, Trial Attys., Tax Div., Dept. of Justice, Washington, D.C., for U.S.

## ORDER IMPOSING SANCTIONS

FONG, Chief Judge.

Judge Martin Pence's August 25, 1987 Order to Show Cause why sanctions should not be imposed upon plaintiff came on for hearing October 14, 1987. The plaintiff, who is an attorney admitted to practice law in the District of Columbia, appeared pro se. Daniel Bent and David Bunning appeared on behalf of the defendant United States. The court, having considered the voluminous record in this case, the submissions and allocutions of all sides, and being fully appraised of the premises herein, now finds as follows:

## INTRODUCTION

The imposition of sanctions is a serious matter, one that requires that this court be thoroughly convinced that such an extraordinary step is appropriate and will reasonably act to deter future abuses. This court has spent a tremendous amount of time preparing for this hearing. In doing so, it has become convinced that Mr. Lapin, a licensed attorney admitted to practice before this court, has persistently and single-mindedly used his suit for a tax refund to wage a personal attack and villification against every attorney who has represented the defendant in this action, against every judge who has ruled against him, and against every clerk, paralegal or representative with whom he has had contact. The court finds that adjudication of Lapin's suit has consumed resources completely disproportionate to its merits. It further finds Lapin has been warned time and time again that his actions would subject him to sanctions at the conclusion of his case. The court finds that Lapin was undeterred by warnings and was undeterred even by imposition of sanctions for discrete incidents. It therefore concludes that it must impose sanctions in an amount sufficient to deter Lapin from continuing to improperly use this court in his crusade against enemies real and imagined.

Sanctions against Mr. Lapin are appropriate in spite of his claim to be a "whistle-blower" entitled to "special consideration" by this court. It is true that whistle-blowers *may* be entitled to claim special "class" status when bringing suit under 42 U.S.C. § 1985(3). *See Lapin v. Taylor*, 475 F.Supp. 446 (D.Hawaii 1979), *criticised in, Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir.1985). This is not a § 1985 suit, however; it is a claim for a tax refund. Lapin is not free to use it as a vehicle to advance all his collateral accusations of government waste, fraud and abuse, whether well-founded or otherwise. This court possesses no power to extend special treatment to persons simply because they fancy themselves "whistle-blowers".

## WHEN THE COURT MAY IMPOSE SANCTIONS

*The Court Retains Jurisdiction to Impose Sanctions.*

■ Although Lapin has filed a Notice of Appeal in the action underlying this Order to Show Cause, an appeal only deprives the court of jurisdiction over the matters properly appealed therefrom. It does not deprive the court of jurisdiction over the question of whether sanctions are appropriate. *Masalosalo v. Stonewall Insurance Co.*, 718 F.2d 955, 956–957 (9th Cir.1983). *See League of Women Voters v. FCC*, 751 F.2d 986, 990 (9th Cir.1985).

*Rule 11.*

Fed.R.Civ.P. 11 provides in part that:

The signature of an attorney or party constitutes a certificate that the signer has read the pleading, motion or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to

cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction....

Rule 11 addresses two separate problems: "first, the problem of frivolous filings; and second, the problem of misusing judicial procedures as a weapon for personal or economic harassment." *Lemos v. Metropolitan Life Insurance Co.*, 828 F.2d 616 (9th Cir.1987); *Zalvidar v. City of Los Angeles*, 780 F.2d 823, 830 (9th Cir.1986).

A filing is frivolous under Rule 11 if it is unreasonable when viewed from the perspective of "a competent attorney admitted to practice before the district court." *Id.* In *Zalvidar*, the court of appeals held that "Rule 11 sanctions shall be assessed if the paper filed in district court and signed by an attorney or an unrepresented party is frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in subjective bad faith." *Id.* at 831.

Rule 11 sanctions are also appropriate when a filing is a misuse of judicial procedures. The standard under this "improper purpose" clause is also one of reasonableness. Objectively viewed, the filing must not be filed for *any* improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. *Id.* This includes filings which are made solely to introduce matters not properly before the court.

"Once a court finds that an attorney has violated Rule 11, it *must* impose sanctions." *Unioil, Inc., et al. v. E.F. Hutton, et al.*, 809 F.2d 548, 559 (9th Cir.1986). Sanctions must, however, be "appropriate." An appropriate sanction is one that is reasonable in scope and in amount, one that will deter future sanctionable conduct but will not act to chill "an attorney's enthusiasm or creativity in pursuing factual or legal theories." *Matter of Yagman*, 796 F.2d 1165, 1182–1184 (9th Cir.1986).

The court possesses discretion in determining the proper measure of an appropriate sanction. Often it will award reasonable attorneys' fees to an opposing party. *See, e.g., Toombs v. Leone*, 777 F.2d 465, 471–472 (9th Cir.1985) In other cases, a different sanction may be more appropriate. *See, e.g., Miranda v. Southern Pacific Transp. Co.*, 710 F.2d 516, 521 (9th Cir. 1983) (district court may impose monetary sanction without a finding of contempt). *See also Link v. Wabash R. Co.*, 370 U.S. 626, 632, 82 S.Ct. 1386, 1389, 8 L.Ed.2d 734 (1962) (dismissal of action under court's inherent power); *Stelly v. C.I.R.*, 804 F.2d 868, 871 (5th Cir.1986) (prohibiting Clerk of Court from accepting any new filings until previous sanctions and judgments paid in full); *Advo System, Inc. v. Walters*, 110 F.R.D. 426, 433 (E.D.Mich.1986) (sanction for waste of judicial resources).

■ The court's discretion as to the amount and timing of an appropriate sanction is much more limited, however. *Yagman*, 796 F.2d at 1182–1184. A sanction is reasonable in amount if it is "quantifiable with some precision and properly itemized in terms of the perceived misconduct and the sanctioning authority." *Id.* at 1184. Sanctions must also be noticed or imposed in a reasonably timely manner. For example, abuses may not be allowed to "pass unchecked and, thus, undeterred" leading the court to impose "years' worth of sanctions in one post-trial lump." *Id.* at 1183. But where, as here, the record discloses that Lapin was warned time and again that his conduct was potentially sanctionable, the court may properly reserve final judgment on the amount of sanctions until the conclusion of proceedings before it. *Id.* at 1184. That is precisely the situation the court has before it today.

*Bad Faith.*

In addition to imposing sanctions under Fed.R.Civ.P. 11, a court may impose sanctions under its inherent power to promote the orderly and just consideration of issues properly brought before it. *In re Itel Securities Litigation*, 791 F.2d 672, 674 (9th Cir.1986). Unlike the looser standard for

imposition of Rule 11 sanctions however, the court must find that Mr. Lapin acted in bad faith before it may impose sanctions under its inherent power. *Id.* at 675; *Toombs v. Leone,* 777 F.2d 465, 471 (9th Cir.1985). *See, Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980); *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1974). The court possesses a discretion as to the measure of sanctions similar to that described above for Rule 11 violations. *Roadway Express,* 447 U.S. at 765, 100 S.Ct. at 2463. However, the stricter standard for imposing sanctions under a court's inherent power implies slightly greater discretion in when and how to apply those sanctions. While this court may never impose unreasonable sanctions, it may use its inherent power to impose sanctions that may not be authorized under Rule 11. *Miranda,* 710 F.2d at 521.

■ A finding of bad faith does not require that the court find that Mr. Lapin took actions which were totally frivolous, although a frivolous action would certainly warrant sanctions. Rather, sanctions may be imposed under the court's inherent power where a litigant is substantially motivated by vindictiveness, obduracy, or *mala fides*—even if he asserts a colorable claim. *Itel,* 791 F.2d at 675. Therefore, Mr. Lapin may not object to the imposition of sanctions on the ground that the facts he attempts to assert are "indisputable." If they are not relevant to his claim for a tax refund and are put forth in bad faith, they are sanctionable.

## 28 U.S.C. § 1927.

■ The court notes that it may also impose sanctions against plaintiff as counsel of record in this case. Under 28 U.S.C. § 1927:

Any attorney ... who so multiplies the proceedings in any case unreasonably and vexaciously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct.

Plaintiff has, over the six years he has pursued his case, held himself out as an attorney, admitted to practice before the District of Columbia bar. On that basis he has been admitted to practice before this court. The fact that he represents himself in a pro se capacity does not make him any less the counsel of record in this case.

■ In order for the court to impose sanctions under § 1927, it must find that Mr. Lapin acted recklessly or in bad faith— the same standard for sanctions under the court's inherent power. *Toombs,* 777 F.2d at 471. *Compare Itel,* 791 F.2d at 675. It is no objection to a finding of bad faith that Mr. Lapin was only concerned with creating as thorough and complete a record as possible. *Toombs,* 777 F.2d at 471. Neither is it appropriate to object to sanctions under § 1927 on the grounds that the Order to Show Cause did not specifically mention § 1927. Any mitigating excuse Mr. Lapin might offer to avoid § 1927 sanctions would also have been offered to avoid Rule 11 or inherent power sanctions. Therefore, Lapin had adequate notice that sanctions under § 1927 may be imposed upon a finding of bad faith. *Id.* at 471–472.

Furthermore, the Ninth Circuit's *Yagman* requirement, that sanctions not be imposed in a lump sum at the end of proceedings, does not apply to § 1927 sanctions which, by their nature, may only be imposed *after* counsel has unreasonably and vexaciously multiplied the proceedings. If the sanctions imposed are otherwise reasonable, it does not matter under § 1927 that they were not imposed or noticed at each step of the proceeding.

## BACKGROUND

The record in this case indicates that Lapin has persistently engaged in practices calculated to harrass and intimidate opposing parties and the court. Such practices began soon after Lapin filed his tax refund suit and continues to the present time. What follows is a thorough, but by no means complete, review of Lapin's abusive practices. The court will describe Lapin's activities in the District Court for the District of Columbia in order to demonstrate

that Lapin continued his abuses there as well as before this court. Those actions form no basis for the sanctions imposed today. Neither do actions for which Lapin has already been sanctioned or actions directed against this judge.

On June 24, 1981 Lapin filed a three page complaint with the Clerk of the Court for the District of Hawaii. The complaint alleged that Lapin had overpaid his taxes for the calendar year 1975 and that he was owed a refund of some $1,600.00. Lapin later amended his complaint to include claims for refunds from calendar years 1977 through 1980. The lawsuit sought to litigate the deductibility of, among other things, certain "away from home expenses," income from the sale of GEICO stock and payments received under the Civil Service Retirement Act.

A significant aspect of Lapin's claim had to do with the fact that he had paid Hawaii state income taxes on the cost of living allowance (COLA) he had received while a federal employee in Hawaii. Lapin had attempted to deduct the amount of these taxes on his federal income tax returns. The IRS had disallowed these deductions pursuant to Revenue Ruling 74–140. Lapin's suit sought, among other things, to challenge the validity of Revenue Ruling 74–140.

On September 8, 1981 Lapin filed a motion to have this issue certified as a class action on behalf of all federal employees who were paid a COLA. Lapin alleged, as partial justification for class certification, that the "Court has recognized him as a federally protected whistle blower entitled to special consideration by the court and statutory protection under 5 U.S.C. §§ 1201–1209." This statute, the Merit Systems Protection Board and Special Counsel Chapter of Title 5, confers no such right on Lapin. Plaintiff's class was never certified and Lapin had no basis for believing it was. Yet, many of his subsequent motions, requests, filings and lodgings were predicated on the fact that Lapin was in fact litigating a class action.

During the fall and winter of 1981/82, Lapin requested production of various documents from defendant United States in an attempt to determine whether some unspecified illegality surrounded preparation and issuance of various IRS Revenue Rulings. The government objected on grounds of relevancy and confidentiality and Lapin's subsequent motion to compel production was denied. Lapin moved for reconsideration and, when that was denied, he filed an objection which was also denied. Lapin would frequently make numerous attempts to obtain reconsideration of decisions that went against him. Over the six years he has litigated this action, such filings have been among the least frivolous of his activities.

After the court refused to compel production, Lapin attempted to obtain the same documents directly from the IRS under the Freedom of Information Act. He did not disclose the fact that the documents were for use in litigation against the IRS. Nevertheless, the IRS ruled that it did not have to produce these particular documents because they were predecisional in nature. A round of unsuccessful objections and appeals followed. Lapin began writing letters to various IRS officials (and filing them with the court clerk). This continued until the IRS district director requested that, in view of plaintiff's legal action, he direct all correspondence through Stephen Fuerth, the government attorney handling the case.

On June 29, 1982, Judge Pence ruled that Lapin was actually a resident of the District of Columbia and that his suit must therefore be transferred to the District Court for the District of Columbia. This ruling was based on Lapin's representations that he was an attorney admitted to the District of Columbia bar and presently practicing law in the Nation's Capitol. This court, on the basis of the record before it, concludes that Lapin was not a resident of the District of Columbia at any time relevant to this lawsuit and that his reason for claiming District of Columbia residency was because his claim for "away from home deductions" were actually for expenses incurred in Hawaii.

Lapin prosecuted his lawsuit in the District of Columbia for three years. He renewed his request for production of the same documents that were denied to him by court order in Hawaii. He filed requests for admissions such as the following:

That after defendant was served with the First Supplemental Complaint, it was more concerned with having such Complaint dismissed than answered.

That the signature on the Answer was made by Attorney J. Brian Ferrel and that such signature is not Mr. Ferrel's signature but is actually, in fact, Mr. Hertz's name in Mr. Ferrel's handwriting. [NOTE: On October 11, 1983 plaintiff filed a Motion for Default Judgment as an Appropriate Sanction Against Defendant for this incident. The Clerk of the Court wisely elected not to enter default judgment and the motion was denied Dec. 5, 1983.]

That had Attorney J. Brian Ferrel conducted a review of the case file and public record regarding Lapin's account with the IRS prior to preparing the Answer, such Answer would have admitted practically all of the allegations presently being denied because of alleged current lack of knowledge.

That Congress said what it meant and meant what it said as its reason for electing to pay a nontaxable COLA separate and apart from the base pay.

On January 9, 1984 Lapin filed a motion for order "Compelling the Production of Documents Previously Ordered to be Produced and Then If Such Documents Are not Produced, Motion for Order Compelling the Refund of Plaintiff's Income Tax Overpayments ..." No such order had ever been given and the court denied the motion.

■ On March 5, 1985 Judge Gasch entered summary judgment for the United States on Lapin's COLA claim for 1975. *Lapin v. United States,* 617 F.Supp. 167 (D.D.C.1985). Its ruling held that the COLA is a class of income exempt from gross income and that I.R.C. § 265(a)(1) bars Lapin from taking any deduction for the COLA, including a deduction for the

amount of state taxes paid on the COLA. Lapin, after the usual round of post decision motions, appealed to the Court of Appeals for the District of Columbia Circuit which on October 29, 1985 dismissed the appeal for lack of jurisdiction. Rather than accepting the district court's decision as the law of his case, Lapin continues—three and one-half years later—to treat the decision as though it were never made. Sanctions are particularly appropriate in res judicata and collateral estoppel situations. *Robinson v. National Cash Register,* 808 F.2d 1119, 1131 (5th Cir.1987).

On August 8, 1985, after partial summary judgment had been entered, Lapin filed another request for production of documents and information. Again he claimed that the court had ordered the documents produced but again no such order appears in the file. Among other things, Lapin wanted the following information:

The date that Mr. William Dean

a) started to clerk for Judge Gasch,

b) applied for his present position with the Tax Division,

c) first had known that he was to be employed by the Tax Division,

d) provided Judge Gasch with written notification of his job prospects with the Tax Division, and

e) terminated his clerkship with Judge Gasch.

A written representation from defendant United States as to whether Arthur A. Oshiro (defendant's attorney), after establishing residence in Hawaii by filing resident State of Hawaii income tax returns, has, under false pretenses, claimed renewal transportation at Government expense for himself and dependants to California by certifying that he continues to be a resident of the State of California during the same period he is not filing any State of California income tax returns.

A written explanation from Mr. Edward J. Snyder (also defendant's attorney) why he refuses to act on Lapin's request to bring to the attention of appropriate officials of the Department of Justice the

massive tax and payroll fraud on the part of the federal judiciary.

On October 7, 1985 Judge Gasch issued a sua sponte order transferring this case back to the District of Hawaii because it appeared that Lapin had no significant ties to the District of Columbia and that he was, in fact, a resident of the State of Hawaii. The court has described the events in the District of Columbia court in order to provide background to the events that took place when the case returned to Hawaii. Since they took place before another court, they are not the basis for today's sanctions.

## CONDUCT SUBJECTING LAPIN TO SANCTIONS

The record is replete with examples of actions taken by Lapin that the court can only characterize as having been made in bad faith. Lapin has already been sanctioned three times by this court. What follows is by no means a complete list of his other sanctionable activity. However, the court finds that the following twenty-six actions are particularly eggregious instances and do subject Lapin to sanctions.

(1) After his case was transferred back to this court, Lapin wrote to the government attorney assigned to defend the action, Mr. David Bunning. As would become his usual practice when writing letters, he filed a copy with the court clerk. The letter contained a "Proposed Notice Regarding Settlement of Class Action Lawsuit" to serve as a basis for negotiations between Lapin and the government. Lapin sent his "Proposed Notice" even though he knew (a) that his class action had never been certified and (b) that the only class claims he had ever alleged—relating to the deductability of Hawaii's tax on COLA—had been effectively thrown out by the District of Columbia court on March 5, 1984. The court finds that the "Proposed Notice" was filed in bad faith to confuse the court and the parties as to what issues were still outstanding in Lapin's tax refund case.

(2) On February 28, 1986, Lapin wrote to Attorney Bunning offering to settle three outstanding claims if, among other things, Bunning would give his promise to obtain an IRS revenue ruling that would allow him to deduct travel expenses incurred as a whistle blower appearing before congressional committees. The court finds that Lapin could not have had any reasonable expectation that Mr. Bunning could make such a promise. Bunning, of course, could not make such a promise and he properly terminated settlement negotiations.

On April 15, 1986 Lapin filed a letter to Bunning which implied that all his COLA claims were still outstanding.

On April 21, 1986 Lapin filed a letter to the Office of Professional Responsibility in order to "bring certain class action aspects of this suit to a conclusion by a method other than trial. These class action aspects concern the immunity of that COLA paid to federal employees of the Executive Branch of Government from State of Hawaii taxation." The court finds that Lapin knew that his lawsuit was not a class action.

(3) On June 10, 1986 Lapin filed a letter requesting government disclosure of information under the Freedom of Information Act (FOIA) to "obtain the best evidence possible to replace the documentary support for his deductions that were previously provided defendant's agents but were twice lost by them" and to "prove that such agents' actions were motivated by an invidiously discriminatory animus based on plaintiff's whistle blowing activities and their desire to attack plaintiff's credibility." Although Lapin has frequently charged that defendant twice lost documents he provided, there is absolutely no evidence that he was ever prejudiced by such an occurrence. There is even less support for Lapin's charge of "invidiously discriminatory animus." Rather, this is an example of plaintiff's propensity to assassinate the characters of those with whom he disagrees. The information Lapin requested from defendant included the following: "all of my applications for repromotion to grade GS–14 since 1969 and the promotion grouping each application was assigned." The court finds that this information could

have no conceivable relevance to his suit for a tax refund.

(4) On June 17, 1986 Lapin filed a Notice of Hearing on a motion he had filed with the District of Columbia court on January 9, 1984 and a request for production of documents he had filed with the District of Columbia court on August 8, 1985. Aside from violating local rule 230–4(a) which provides that the court will entertain no discovery motion until counsel have previously met and conferred concerning all disputed matters, this motion shows that Lapin was clearly aware of the proceedings in the District of Columbia court. His failure to abide by that court's judgment against him is all the more egregious because of this awareness.

(5) The government appeared to be at a loss as to how to respond to Lapin's Notice of Hearing on motions filed ten and twenty-nine months previously in a different district court. Its response apparently included submission of an incomplete photocopy of the District of Columbia docket sheet. Lapin's response was to file on July 8, 1986 a "Motion for Default Judgment as Partial Remedy" for defendant's alleged "perpetration of a fraud upon the court." This motion was frivolous, served only to harrass defendant and the court, and was subsequently denied.

On July 14, 1986 Lapin filed a letter he had written to U.S. Attorney Daniel Bent expressing outrage at the fraudulent docket sheet.

On July 22, 1986 Lapin and defendant attended a status conference in the chambers of Judge Martin Pence, to whom the case had been assigned. Judge Pence told defendant to make a good faith effort to produce many of the various documents Lapin had requested. In addition, Lapin raised the question of whether he would be able to incorporate additional claims into his suit for a tax refund. The following exchange took place:

THE COURT: All right. So you want then the information so that you can go ahead with another lawsuit. Is that it?

MR. LAPIN: No, sir. Not another lawsuit. Under Rule 15 I want to expand this lawsuit to conform with all the proof that I'm going to bring to your court, Your Honor.

THE COURT: Well, counsel, I'll tell you, you may bring it but you won't bring it in this case. All I think that this Court is going to concern itself with, I'll tell you flatly right now, is just what you put out in—what was it here, your first supplemental complaint.

MR. LAPIN: Well, what about my pretrial statement, Your Honor.

THE COURT: Never mind your pretrial statement. I'm talking about what's going to be heard in this Court and it's going to be on your tax problem. If you've got some other claims, I'm not going to let you fire what's commonly known as a blunderbuss type of lawsuit. If you want to sue the United States because they didn't do right by you in some other areas, that's fine. But in this case, the only one that's before us is the matter of your tax refund.

MR. LAPIN: I'm glad you clarified that, Your Honor.

Lapin therefore knew that he would not be permitted to incorporate any collateral claims into his suit for a tax refund. Since July 22, 1986 his statements and actions clearly indicate that he has made a concerted effort to do just that. This court can only conclude that this effort was made in bad faith to harrass defendant and the court, to needlessly multiply the proceedings and to otherwise obfuscate the weaknesses in Lapin's underlying case. Lapin's subsequent actions completely disregard Judge Pence's admonition at the July 22, 1986 status conference.

On September 3, 1986 Lapin filed a letter he had written to the Judge Advocate General regarding its recent denial of his FOIA request. The letter states that, rather than appeal denial, Lapin will request that the court perform an in camera inspection of the documents he had requested. No such request was ever made of the court.

(6) On September 29, 1986 Lapin filed a Motion for Sanctions pursuant to Fed.R. Civ.P. 37. The motion concedes that defendant complied with most of the dis-

covery requests that were endorsed by the court on July 22, 1986, but alleged that Attorney Bunning "completely ignored the court's order for him to determine, when, why and who in the IRS discarded Lapin's input ... to support Lapin's refund claims." In fact, the court only ordered defendant to produce whatever documents it had relevant to "Mr. Lapin's tax problems." Lapin's motion again asked for default judgment. It was denied.

(7) On September 30, 1986 Lapin filed a series of letters concerning the "Refusal of Judge Advocate General to Comply With Court Ordered Discovery". The title of this document speaks for itself.

(8) On October 6, 1986 Lapin filed a Motion for Sanctions Against Defendant for Failure to Comply with Court's Oral Discovery Order and for Abuse of the Discovery Process. This motion alleged that defendant's interrogatories were unduly burdensome in that they requested information that the IRS either already possessed or had "twice lost".

(9) On November 17, 1986 Lapin filed a Motion to Compel Defendant to Comply With Court's Oral Orders of July 22, 1986. This was now Lapin's third outstanding motion alleging failure to comply with the court's discovery orders. All were baseless. The fact that plaintiff refused to await adjudication of the first before filing others demonstrates a bad faith desire to harrass defendant and the court.

(10) On January 13, 1987 Lapin filed a letter he had written to Daniel Bent regarding the "need for a de novo determination whether federal judges should receive COLA." This document marks the first time in over five years of litigation that Lapin or anyone else raised the issue of applying COLAs to federal judges. The court notes that defendant had recently filed a motion for partial summary judgment.

(11) On February 2, 1987 Lapin filed letters to, among others, the IRS's acting regional inspector pointing out an "unwillingness on the part of cognizant officials to correct certain erroneous GAO decisions which resulted in the nonpayment of the COLA authorized to be paid to ... federal judges in Hawaii since January 1, 1943."

(12) On February 10, 1987 plaintiff filed a letter to the General Accounting Office regarding "the need for the Comptroller General to refer certain matters concerning the COLA to the Claims Court for resolution."

On February 18, 1987 by oral decision Judge Pence denied all of Lapin's outstanding motions and granted defendant's motion for partial summary judgment. Judge Pence placed Lapin on notice that he could expect to be sanctioned for his "frivolous motions" and he invited defendant to file a motion for sanctions under Rule 11.

(13) On February 25, 1987 Lapin filed a request that Judge Pence disqualify himself because "it is undisputed that the principal issue in this action concerns the classification and tax status of the same COLA that Judge Pence himself admits that he has a financial interest in." The request was dismissed on March 3, 1987. The court finds that Lapin manufactured the issue of the COLA's application to Judge Pence out of whole cloth in order to create a basis for objecting to the court's summary judgment decision, should it go against him. The court further finds that this purposeful use of filings and letters to "create facts" constitutes an abusive manipulation of the judicial process. Lapin's abuses were, however, just beginning.

(14) On March 3, 1987 Lapin filed a letter to the GAO notifying it that Lapin intended to make a review of the Court Library Fund "during the tenure of Martin Pence as Chief Judge of the United States District Court for the District of Hawaii."

(15) The next day, Lapin filed a letter to Attorney General Edwin Meese requesting that he "determine whether the attached May 15, 1986 Financial Disclosure Report by Senior Judge Martin Pence includes any violations for which action by you would be appropriate under 28 U.S.C. App. 1 § 304(a) ... Specifically, I am concerned about (1) the omission of his wife's trust income and trust value, (2) the classification of his annuity, and (3) his failure to disclose the fact

that he did perform an adjudicatory function in litigation in which he had a financial interest ..."

On March 12, 1987 Lapin wrote to Chief Judge Harold Fong requesting that his tax refund case be suspended and that a committee be appointed to investigate Judge Pence. Judge Fong replied on March 13, 1987 that he had no such power.

(16) On March 13, 1987 Lapin lodged a "request" that Judge Pence specify, from a list provided by Lapin, the stocks and bonds presently held by his wife in the "Eleanor Fisher Pence Trust". Judge Pence declined to so specify.

On March 16, 1987 Lapin again wrote to Judge Fong requesting that his tax refund case be suspended until matters of Judge Pence's alleged ethical violations had been resolved. Judge Fong declined the request on March 30, 1987.

This court found in its order of August 13, 1987 that these letters had no relevance to Lapin's tax refund case and were part of a "personal vendetta by plaintiff to embarras Judge Pence." The court affirms that finding today and further finds that they were motivated by a desire to intimidate Judge Pence into reversing his summary judgment decision. The court therefore concludes that the letters were filed with the court clerk for an improper purpose and in bad faith. However, these letters will not form the basis for sanctions against Lapin since two of them were addressed to Judge Fong, who has told Lapin that no action involving Judge Fong will be sanctioned today.

(17) On March 25, 1987 Lapin filed a Request for Court to Vacate Summary Judgment Decision. The Request raised no issues relevant to the merits of plaintiff's case and was denied the next day.

(18) On March 30, 1987 Lapin filed a Motion to Vacate Court's Decision on Summary Judgment as Pertains to Issues Other Than 26 U.S.C. § 265(a)(1) Issue of Calendar Year 1980. The court denied this second request the next day, finding Lapin's Request "filled with so-many self-serving and erroneous conclusions, both as to fact and as to law, so many factual and legal errors, and such a hodge-podge of self-manufactured complaints, all without raising a single meritorious issue, that, in tot, it can only be deemed to be a frivolous motion unworthy of any more consideration ..." In the same order, the court again placed Lapin on notice that it would consider the question of sanctions once proceedings were over on the remaining issues.

On April 6, 1987 Lapin filed a motion that his remaining claims be dismissed with prejudice. A copy of Lapin's motion is attached as Exhibit A to this order. On April 14, 1987 the parties filed a stipulated dismissal with prejudice. Lapin filed this request for dismissal in part because he desired a final judgment that he could appeal to the Court of Appeals for the Ninth Circuit and in part because the United States agreed not to seek sanctions for Lapin's actions up to that date. In its statement in support of today's sanctions, the government stands by its agreement with Lapin, although Lapin seems to have violated his part of the bargain. In deciding, sua sponte, to impose sanctions the court is not bound by the settlement agreement. However, the court notes that awarding attorneys' fees to the government may place it in an awkward position, since Lapin has appealed his settlement to the Court of Appeals.

The court will now briefly describe plaintiff's actions for which the court has already imposed sanctions. These actions do not form the basis for today's sanctions but they are noted here in order to provide a complete picture of the case before the court.

In May 1987 Lapin apparently had second thoughts about his stipulated dismissal. On May 14 he filed a motion under Rule 60(b) to vacate his stipulated dismissal. On July 7, 1987 the court found the motion's grounds irrelevant to the merits of Lapin's case and an abuse of process. The court denied the motion and imposed sanctions under Rule 11 in the amount of $362.32, the government's reasonable attorneys' fees and costs incurred responding to the motion. The court further noted that Lapin had persistently filed letters with the

court clerk that are irrelevant to his tax refund case. The court ordered Lapin not to file any more such letters or risk being found in contempt of court. On August 11, 1987 the court found that Lapin had in fact convinced the court clerk to convert three "lodged" letters to "filed" status on August 5, 1987. The court held Lapin in contempt of court and fined him $1,000.00 per document.

On May 28, 1987 Lapin caused a subpoena to be served on Senior Judge Pence, commanding him to appear on June 8, 1987 and produce various personal financial documents and to produce a premarital agreement. On June 8, 1987 Judge Pence filed a Motion for Order Quashing Subpoena and Awarding Sanctions. On June 19, 1987 Lapin caused a deposition subpoena to be served on Mrs. Eleanor F. Pence and, on June 29, 1987 Mrs. Pence filed a Motion for Order Quashing Subpoena, Granting Protective Order, and Awarding Sanctions. On July 6, 1987 a hearing was held on the motions before Judge King of this court and the subpoenas were quashed. In its order of August 13, 1987, the court found that:

Plaintiff's motive for causing the subpoenas to be issued was to annoy Judge Pence in an attempt to create a bias in the Judge against Plaintiff. Plaintiff obviously hoped to use such bias to disqualify Judge Pence and invalidate the Judge's rulings adverse to Plaintiff. Therefore, it is appropriate to impose sanctions on plaintiff.

The court confined its consideration of sanctions to the matter of Lapin's subpoenas, awarding the Pences $13,280.63 as reasonable and documented attorney's fees and costs.

The court finds that Lapin failed to end his abusive bad faith conduct after repeated warnings that he would be subject to sanctions at the end of the proceedings. The court further finds that once it began to impose sanctions for particular examples of his abuse of judicial processes, Lapin's conduct became even more outrageous. A limited number of examples illustrate this conclusion.

(19) On July 29, 1987 Lapin filed a Reply to Opposition of United States to Plaintiff's Motion to Vacate Judgment, in which he argued that "the Executive Branch of the Federal Government, acting through David Bunning ... has entered into an understanding with Senior Judge Martin Pence, a public official, who, undisputedly, has been in violation of the financial requirements of the Ethics in Government Act of 1978 from CY 1981 to the present time, not to enforce the financial disclosure requirements of the Ethics in Government Act of 1978 vis-vis Martin Pence if Martin Pence would consistently rule against all claims for refund and motions by Jake Lapin...."

After the Pences' motions to quash subpoenas was transferred to Senior Judge Samuel King, Lapin in early July informally requested the Judge King "arrange for an active judge who has no previous social or business contact with Martin Pence or his spouse to hear this motion." The informal request was denied by order of the court on July 10, 1987.

(20) On July 22, 1987 Lapin filed an Affidavit of Bias or Prejudice of Senior Judge Samuel King. Plaintiff's request for recusal was denied on July 24, 1987.

(21) Undeterred, Lapin made a third attempt to prevent Judge King from hearing the motions to quash. On July 27, 1987 he filed "Plaintiff's Timely Affidavit of Bias or Prejudice From an Extrajudicial Source For Which Senior Judge Samuel P. King Did Rule That He Would Recuse Himself." On July 31, 1987 Judge King again denied Lapin's request to recuse.

On August 5, 1987, one day after the court issued its findings of fact, conclusions of law, decision and order on the Pences' motions to quash, Lapin filed a Request That Court Reconsider Decision and Order In Response to Plaintiff's Second Affidavit of Bias or Prejudice. The court denied the request on the same day.

(22) On August 6, 1987 Lapin filed an "Ex Parte Filing of GEICO Document That Plaintiff Provided Twice to the Defendant but Which Was Lost by Defendant, Twice". This "GEICO Document" is actually a Mo-

tion for Relief from an order dismissing with prejudice one of Lapin's many previous lawsuits. Like other documents filed in this case, the "GEICO Document" consists of self-serving and largely irrelevant statements and this court finds that it was filed here solely to burden a judicial system already heavily burdened with plaintiff's many irrelevant filings.

(23) On August 7, 1987, after Judge King had ruled against him on the Pences' motions to quash and for sanctions, Lapin carried his personal attacks to Judge King. His Affidavit of Jake Lapin Re Attorney's Fee and Costs is worth setting forth from paragraph 2 to the end:

2. Although the court has ruled in favor of the Pences, I sincerely believe that the record clearly indicates that I would have been the prevailing party had an active judge without any bias in favor of the Pences or prejudice against me ruled on the Pences' motions; and, I hereby reiterate a portion of the record by incorporating, herein, by reference, as though fully stated, PLAINTIFF'S AFFIDAVIT AS TO PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, DECISION AND ORDER, which was filed in this matter on August 3, 1987 as CR 171.

3. I sincerely believe that had Martin Pence's financial disclosure reports received the same scrutiny from the Judicial Ethics Committee as those financial disclosure reports from Attorney General Meese received from the General Accounting Office, Martin Pence would have been recommended for prosecution under 28 U.S.C.App. 1, 304 after refusing to, sua sponte, correct these reports; and, I sincerely believe that the reason why the Judicial Ethics Committee will not scrutinize these financial reports is because it believes they are nonsense, as noted by Senior Judge Samuel P. King, but which the GAO, nevertheless, takes seriously, as indicated in the Exhibit 1 story entitled "Meese didn't reveal all assets" which was included in the August 5, 1987 edition of the *Honolulu Star Bulletin.*

4. I sincerely believe that the reason Senior Judge Martin Pence completely reversed his July 22, 1986 decision in favor of me during the February 18, 1987 hearing was because, in the interim, the Harry Claiborne impeachment proceeds (sic) were televised and Martin Pence knew, full well, that he could not survive a Harry Claiborne-type investigation, which, according to Harry Claiborne, was triggered because the Department of Justice did not approve of Nevada Federal Judge Harry Claiborne's judicial rulings.

5. I sincerely believe that if Harry Claiborne were tried before Senior Judge Samuel P. King, Nevada Judge Claiborne would have been exonerated because the tax evasion audit of Judge Claiborne's federal income tax returns was triggered by Department of Justice officials who didn't like Judge Claiborne's decisions and that Senior Judge Samuel P. King, after permitting Judge Claiborne to quash any discovery subpoenas, would permit Judge Claiborne to sue these Department of Justice officials for abuse of process and allow Judge Claiborne to collect fees and costs from these Department of Justice officials.

6. I sincerely believe that if Attorney General Meese were tried before Senior Judge Samuel P. King, he would be exonerated because Judge King believes that the financial disclosure reports are nonsense.

7. Because I am a congressionally-recognized whistle-blower who is being harassed by a federal judge and his counsel for blowing the whistle on this judge's noncompliance with the financial disclosure requirements of the Ethics in Government Act of 1978, I am entitled to claim treble the fees and costs awarded to FELIX A. MACISZEWSKI. a former law clerk to Judge Pence and a current member of the Committee on Discipline for this court in my appeal No. 87–2292 before the Ninth Circuit Court of Appeals.

Further Affiant sayeth naught.

(24) On August 10, 1987 Lapin filed a Request for Relief From Decision and Or-

der Dated and Filed on August 4, 1987 on the grounds that the decision was void for lack of jurisdiction. Lapin's contention was that since he had appealed, the court had no jurisdiction to adjudicate the motions to quash. The court finds this argument unwarranted by existing law or a good faith argument for an extension, modification or reversal of existing law.

(25) On August 14, 1987 Lapin filed a Request for Relief from the court's decision and order assessing sanctions relating to Lapin's subpoenas. The Request was denied on the same day.

(26) On August 17, 1987 Lapin filed an Affidavit In Opposition to Order Denying Plaintiff's Request for Relief From Decision and Order. On the same date Lapin filed a Notice of Appeal stating that he intends to appeal a dozen different decisions that the court has made against him.

■ On August 25, 1987 Judge Pence issued the Order to Show Cause that is the subject of this hearing. Based upon the record summarized here and based upon the submissions and oral allocution of the parties to this tax refund suit, the court finds that sanctions are not only appropriate but are required to send a clear message to Mr. Lapin that his tactics of legal terrorism will not be tolerated in the courts of the United States of America. The court finds itself in a position similar to that of the district court in *Cook v. Peter Kiewit Sons Co.,* 775 F.2d 1030 (9th Cir. 1985) In that case the plaintiff engaged in similar tactics designed to intimidate and harrass the court and opposing parties, including the filing of lawsuits against judges, defendants' counsel and court clerks. Sanctions were as appropriate in that case as they are here. The only remaining question concerns the proper measure and amount of sanctions.

## MEASURE AND AMOUNT OF SANCTIONS

Because the government's settlement agreement with Lapin precludes it from asking for attorney's fees incurred prior to settlement, the court declines to impose those costs as sanctions. It does so merely to avoid placing the government in a potentially awkward position before the Court of Appeals for the Ninth Circuit now that Lapin has decided to appeal his settlement. Instead, the court will measure the cost of Lapin's bad faith by a different yardstick: by the cost to the judicial process of the United States. There is no doubt that Lapin's abuses have placed a considerable strain on already strained judicial resources and that there is ample precedent for holding him accountable for their cost to the taxpayers. *See, e.g., Advo System, Inc. v. Walters,* 110 F.R.D. 426 (E.D.Mich. 1986); *Itel Containers Intern. v. Puerto Rico Marine Mgt.,* 108 F.R.D. 96 (D.N.J. 1985); *Olga's Kitchen v. Papo,* 108 F.R.D. 695 (E.D.Mich.1985); *Dominquez v. Figel,* 626 F.Supp. 368 (N.D.Ind.1986). The court cannot begin to estimate the number of hours spent since 1981 preparing for and conducting hearings, responding to utterly frivolous arguments, issuing orders for motions that should never have been filed, and administering a case file that contains countless irrelevant filings. It will not attempt to do so, in part because the court is concerned that any sanction it imposes not be so great as to impose a substantial financial hardship upon Lapin. On the other hand, the court considers it imperative to send Lapin a clear message, that his abuses will not be tolerated. The court notes previous findings of this court, that Lapin's financial assets are considerable and, for example, include receipt of $334,025.00 from the sale of GEICO stock in 1979. Therefore, upon consideration of Lapin's ability to pay, the court will limit its consideration of sanctions to the frivolous, irrelevant and bad faith filings enumerated above, to the cost of its preparation for this hearing today and to the time spent in today's hearing as well as in the initial September 9, 1987 hearing on this Order to Show Cause.

. ■ According to a recent study, a single hour spent by a federal judge on a case costs the taxpayers approximately six hundred dollars. Levin and Collins, "Containing the Cost of Litigation," 37 *Rutgers L.Rev.,* 219 (1985). The court has, since

September 9, 1987, spent a total of seventy-eight hours reviewing the record, researching the law, drafting this order and otherwise preparing for today's hearing. The six hundred dollar an hour figure mentioned above refers specifically to time spent in the courtroom. Obviously, a federal judge's out-of-court time costs the taxpayers considerably less: no more than two hundred dollars an hour. Even at this much lower rate, this hearing has consumed significant judicial resources. For the continued and persistent abuse of the judicial process that has resulted in this hearing, Mr. Lapin is assessed a sanction amounting to seventy-eight hours multiplied by two hundred dollars an hour, for a total of $15,600.00. To this figure will be added the cost of holding this hearing, which has lasted two and one-half hours, as well as the September 9, 1987 hearing, which lasted one and one-half hours. These four hours will be multiplied by the full six hundred dollars an hour, for a total of $2,400.00. Finally, the court has enumerated at least twenty-six improper, irrelevant and/or bad faith filings. Each filing would have required an average of two hours of the court's time to address. At the out-of-court rate of $200.00 an hour, Lapin will be assessed a sanction of $400.00 for each of the twenty-six sanctionable violations, for a total of $10,400.00. Mr. Lapin is therefore ordered to pay to the Clerk of the Court a total sanction of $28,400.00.[1]

The court is compelled to take this action today knowing that it may also be subjected to accusations, innuendo and hysterical ravings of the lowest and most personal sort—as has befallen all previous judges who have handled this case. The court will not be intimidated in its duty to this Order to Show Cause, however. The court has no choice but to impose a heavy sanction in the hope that Lapin will cease his abusive and malevolent activities and will confine himself to pursuing the appeal of his tax case. The plaintiff is ordered in no un-

certain terms to forthwith cease and refrain from any further personal villification of the moral character and personal lives of any witness, lawyer or judge connected with this case. If he does not, this court retains jurisdiction to impose further sanctions as they are warranted up to and including finding Lapin in criminal contempt of court.

IT IS SO ORDERED.

---

1. In arriving at an average time of two hours for each sanctionable violation and a cost of $200 for each hour, the court has considered the time and expense of the judge's staff, including law clerks, externs and secretary, along with their respective activities. These include research, review of the case file (which at present stands approximately three feet high and includes many thousands of pages), drafting of orders, typing, etc.