Mattiebelle HARRIS, et al., Plaintiffs,

v.

John O. MARSH, Jr., Defendant.

Leonza LOFTIN, Plaintiff,

v.

John O. MARSH, Jr., Defendant.

Nos. 81-60-CIV-3, 80-168-CIV-3.

United States District Court,
E.D. North Carolina,
Fayetteville Division.

Aug. 31, 1988.

---

J. LeVonne Chambers, Chambers, Stein, Ferguson & Decton, Charlotte, N.C., Jack Greenberg, Charles Steven Ralston, New York City, for plaintiffs.

Dennis Moore, Asst. U.S. Atty., Raleigh, N.C., Peter B. Loewenberg, Asst. U.S. Atty., Office of the U.S. Atty., Tampa, Fla., Cpt. Thomas J. Feeney and Cpt. Richard O. Hatch, HQDA (DAJA–LTC), Robert B. Williams, MAJ, JAGC, Civilian Personnel Litigation, Office of Judge Advocate General, Dept. of the Army, Washington, D.C., for defendant & the U.S.

William C. McNeill, III, San Francisco, Cal., Gregory Weeks, Parish, Cooke & Weeks, Fayetteville, N.C., for Sandra L. Blue.

John Vanderstar, Covington & Burling, Washington, D.C., Richard B. Whisnant, Robinson, Bradshaw & Hinson, Charlotte, N.C., for Penda D. Hair.

Conrad K. Harper, New York City, Wayne Alexander, Casey, Bishop, Alexander & Murphy, Charlotte, N.C., for Geraldine Sumter.

Adam Stein, Chapel Hill, N.C., for Ferguson, Stein, Watt, Wallas & Adkins, PA.

Bonnie K. Steingart, Fried, Frank, Harris, Shriver & Jacobson, New York City, George Daly, Charlotte, N.C., for Julius L. Chambers.

Jeh C. Johnson, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Arthur L. Lane, Fayetteville, N.C., for Gilda Glazer.

Cressie Thigpen, Raleigh, N.C., for Beulah Mae Harris.

Barington D. Parker, Jr., Morrison & Foerster, New York City, James C. Fuller, Jr., Throp, Fuller & Slifkin, Raleigh, N.C., for NAACP Legal Defense & Educational Fund, Inc.

## ORDER

JAMES C. FOX, District Judge.

In an extensive Opinion and Order filed December 28, 1987, and Judgment filed December 30, 1987, the court directed plaintiffs Beulah Mae Harris and Sandra Blue, as well as their counsel, to pay defendant and the court the sum of $83,913.62 as a sanction for filing, pursuing, and in some

cases, belatedly abandoning, meritless, frivolous and vexatious claims. *Harris v. Marsh*, 679 F.Supp. 1204 (E.D.N.C.1987). Of this amount, $53,913.62 was assessed against plaintiffs' counsel under the "bad faith" exception to the American Rule, 28 U.S.C. § 1927, and Rules 11 and 16 of the Federal Rules of Civil Procedure. *Id.* at 1392. Individually, Julius Chambers was assessed the sum of $30,000, Geraldine Sumter the sum of $12,500, Gilda Glazer the sum of $5,000, Penda Hair the sum of $5,000, and the law firm of Ferguson, Stein, Watt, Wallas & Adkins the sum of $1,413.62. *Id.*[1] The remaining sum of $30,000 was proportionately ordered against plaintiffs Blue and Harris under the bad-faith exception and, with respect to Harris, Rule 11. *Id.*

This matter is now before the court on a number of post-trial motions filed by the parties and their counsel: (1) plaintiff Blue's motion to alter or amend judgment pursuant to Fed.R.Civ.P. 59(e); (2) Blue's subsequent motion to withdraw her Rule 59(e) motion; (3) plaintiffs' motion for leave to complete a trial exhibit; (4) Gilda Glazer's motion to reconsider pursuant to Fed.R.Civ.P. 60(b); (5) Penda Hair's Rule 60(b) motion to reconsider; (6) Julius Chambers' Rule 60(b) motion to reallocate costs and sanctions; (7) Geraldine Sumter's Rule 60(b) motion to reconsider; and (8) defendant's motion for additional sanctions in the case of Sandra Blue. Responses have been filed to all motions and oral argument was entertained by the court in Wilmington on March 31 and April 1, 1988.[2] Thus, the issues raised by post-trial filings are ripe for disposition and will be addressed *seriatim.*

Preliminary to discussing the initial motion, the court notes that all findings of fact and conclusions of law set forth in 679 F.Supp. 1204 are, as relevant to any motion at bar, incorporated in this order. Detailed findings contained in the court's previous order simply will not be repeated here. Thus, this opinion must be read in conjunction with the court's earlier disposition of the matters now under reconsideration. Indeed, maximum comprehension of the court's previous order and this opinion will be achieved only by a full review of the entire case record, a task nigh impossible because of its volume. With that caveat in mind, the court turns to

## I. *Blue's Rule 59(e) Motion and Subsequent Motion to Withdraw Same*

On January 15, 1988, Blue filed a Rule 59(e) motion seeking amendment of the judgment in the instant case. No grounds supporting the motion were tendered or argued, but since Blue's counsel simultaneously moved to withdraw from representation due to conflict of interest, Blue was granted an extension of time within which to retain independent counsel and file a supporting memorandum of law. Orders of January 22, 1988.

Having retained new counsel, on March 14, 1988, Blue moved to withdraw her previously filed Rule 59(e) motion, deciding "pursuance of said motion would serve no purpose and would probably be denied." Motion at p. 3. Whether a substantive motion would have presented issues of merit we will never know, since none was filed. Thus, counsel's prediction of the outcome of such a motion is, at best, speculative.

Nevertheless, plaintiff's request to withdraw her earlier Rule 59(e) motion clearly represents a knowing, voluntary and intelligent decision made with the advice of counsel. At hearing, all parties were in agreement the motion should be allowed and, accordingly, Blue's motion to withdraw her January 15, 1988, filing is GRANTED.

## II. *Plaintiffs' Motion for Leave to Complete an Exhibit*

Over two and one-half years after the event, plaintiffs' former counsel, Geraldine

---

1. Counsel were also reprimanded and assessed the sum of $250 each for breach of professional responsibility.

2. All forms of citation to the record utilized in the court's prior opinion remain in effect for this order. In addition, where appropriate, the court will refer to specific pages of the two volume transcript from the 1988 hearing as "Trans.Vol. (date), p. ___."

Sumter, now seeks to "complete an exhibit" from trial. Specifically, Sumter seeks leave of court to file Verification and Approval forms signed by plaintiffs Samuel Sheppard, Diane Sheppard, Violet Henderson and Sandra Blue on July 16, 1985, ostensibly in order to complete Court Exhibit No. 1, the exhibit having been so identified and marked at trial on July 17, 1985. These forms apparently were signed by plaintiffs after the initial *draft* of a *proposed* settlement agreement in this matter was read and explained to them by plaintiffs' counsel. The form Verification and Approval sheets at issue were received by plaintiffs' counsel *after* July 17, 1985, and for some unexplained reason, were never tendered to the court to be placed in the record at the time of receipt. Sumter, apparently having come across the documents in review of her file this spring, now seeks to introduce them into the record. Defendant strenuously opposes Sumter's motion and, for the reasons which follow, the court agrees with the defendant.

During July of 1985, trial of this matter was ongoing in Wilmington. Simultaneous with trial, however, the parties were conducting late night negotiations aimed at resolving the entire dispute. On July 17, 1985, the parties initially tendered to the court a "Final Agreement," categorized as a stipulation of dismissal, pursuant to Fed. R.Civ.P. 41(a)(1). In reviewing that document to determine if indeed a proper stipulation had been filed, thus terminating the litigation, it quickly became apparent *to all concerned,* that the "Agreement" contained a number of flaws and failed to meet the requirements of a stipulation under Rule 41(a)(1).

To begin with, Rule 41(a)(1) requires that a stipulation contain the signature of "all parties who have appeared in the action." In an effort to meet this requirement, plaintiffs' counsel telephonically, or in person, read a copy of the proposed agreement

reached with defense counsel to each plaintiff, discussed the agreement with the plaintiffs, and requested they sign a Verification and Approval of said agreement which could then be attached to the three-page "Final Agreement" tendered to the court.

As the transcript of July 17, 1985, establishes, at the time the Agreement was tendered to the court, a number of plaintiffs either had not signed Verification and Approval sheets or the forms, allegedly signed, were in transit, but not yet in possession of plaintiffs' counsel. Plaintiffs in this category were Samuel Sheppard, Sandra Blue, Violet Henderson, Diane Sheppard and James Love. Trans., Vol. July 17, 1985, at 132–41. As the court noted at the time, in order for the tendered stipulation to be effective, *all parties* must be signatories. That never occurred in this case—indeed to this day, there is no Verification and Approval sheet in the record or proposed for the record with respect to the July 17 "Agreement" from James Love. And, at the time the "Agreement" was proffered to the court, five signatures were lacking. Accordingly, the court refused to accept the "Agreement" as a valid stipulation of dismissal terminating the case and, due to other concerns raised by counsel themselves, *see infra,* the court declined to dismiss the action, in its discretion, as to the signatory plaintiffs under Fed.R.Civ.P. 41(a)(2).

Even had the signature problem been remedied, the proposed "Agreement" was never filed because in dialogue with the parties, both sides indicated concerns with and deficiencies in the document as tendered to the court. First, plaintiffs' counsel themselves recognized and agreed there were inherent defects in the "Agreement" because counsel had edited the document *after* plaintiffs were explained its initial contents, thus, plaintiffs had not seen or been explained the edited version.[3] In this

---

3. The Court: (interposing) Have they [plaintiffs] approved it? Have you read the language to them, Ms. Wright [plaintiffs' counsel]?

Mrs. Wright: No, your honor, we haven't. And I'm going to agree with the court's concern this morning about attempting to put in a revised final agreement without the clients seeing it.... It changes what they say they

sense, then, even the received Verification and Approval sheets were a nullity as to the edited "Agreement."[4]

Second, discussion established the parties differed in their interpretation as to the relationship between the proposed "Agreement" and an earlier March 4, 1985, Agreement which, at the time it was entered, formally settled a number of issues in the case. Third, since James Love, a signatory to the March filing, refused to sign the July "Agreement," by the end of the dialogue between counsel on July 17, defense counsel had determined the proposed July "Agreement" could not be entered with respect to any plaintiff because defendant only wished to do so if the July terms vitiated the March Agreement *in toto* —a condition which could not occur without Love's consent.[5]

In sum, not only were the July 17, 1985, "Final Agreement" and edited "Final Agreement" not proper stipulations of dismissal, *i.e.*, never filed or signed by all parties, but in the end, no mutual assent as to the terms of any proposed settlement existed between counsel, let alone plaintiffs, on that date. As such, the matter was left open for the parties to continue their negotiations, which they did, resulting in the dispositive July 31, 1985, "Final Agreement."[6]

■ With that background in mind, the court now turns to the merits of Sumter's motion to file the July 1985, Verification and Approval forms of four plaintiffs. From the preceding it is clear that one

reason the July 17, 1985, negotiations failed to come to fruition was the lack of the signature forms counsel now desires to add to the record. What occurred on July 17 is a matter of historical fact and it may be neither altered nor confused by additions to the record years later. Decisions on July 17, 1985, were made by counsel and the court based on events as they then existed and were understood. To the extent counsel wished to place the late Verifications into the record upon their receipt, counsel could have moved to do so in July of 1985. That was not done. The record has long since been closed and the court finds no reason for it to be re-opened years later and months after judgment was entered.

In addition, counsel proffers not the first reason to suggest why the motion at bar comes in such an untimely manner. It is far from a legitimate excuse to say the documents were just found while preparing the record on appeal.

■ Finally, plaintiffs' reply to defendant's opposition to this motion suggests their only reason for attempting to now secure inclusion of the four Verifications in the record is to "assure a complete record on appeal." This argument fails, as the record on appeal, *i.e., the trial record,* was long ago complete. What plaintiffs apparently are attempting to do is not supplement an unfinished record, but alter a closed one. Such manipulation of the record the court will not allow—history and

---

signed. ... And there are some ethical problems that we would have with that as well, your honor.
Trans., Vol. July 17, 1985, at 133. *See also id.* at 135.

**4.** The original "Final Agreement" is, as stated, Court Exhibit No. 1; the edited "Final Agreement" is marked as Court Exhibit No. 3.

**5.** Under the March terms, Love and other plaintiffs were entitled to a $75,000 payment from defendant in return for dismissal of their claims. Absent Love's agreeing to vitiate defendant's March obligations, he was entitled to some or all of the $75,000, a scenario defendant found unacceptable. *See* Trans., Vol. July 17, 1985, at 142–44, 153–55 (Loewenberg specifical-

ly stating continuing provisions as to Love unacceptable to defendant).

**6.** Neither Beulah Mae Harris nor Sandra Blue were signatories to the July 31, 1985, "Final Agreement." To the extent the court has heretofore characterized the "Agreement" as a stipulation of dismissal under Rule 41(a)(1), that label may well be incorrect. In order to render harmless any such error, the court expressly holds what is obvious from the record, the "Final Agreement" is a fair settlement of a substantial portion of this case and is, without reservation, accepted by the court, whether it is considered under Rule 41(a)(2) or otherwise. *See* August 19, 1985, Declaration of Peter Loewenberg (Tab 478) (accurately explaining Blue and Harris' exclusion from the July 31 Agreement).

justice demand we be more faithful to the past than that.

Accordingly, Sumter's motion for leave to complete Court Exhibit No. 2[7] is DENIED.

### III. *Gilda Glazer's Motion to Reconsider*

As former counsel for plaintiffs, Glazer moves to reconsider that portion of the court's opinion imposing sanctions and allocating fees and expenses against her personally. In support of her motion, Glazer argues (1) she was not employed by or affiliated with plaintiffs' Charlotte law firm after July 1, 1984, (2) she received no notice of pending motions for sanctions against her and, thus, no opportunity to defend, (3) as an associate working under Chambers' direction, she relied on his advice and direction on questions of litigation procedure, strategy and tactics, and (4) with respect to the ethical breach, counsel internally recommended to her colleagues that Alicia Chisholm and Beulah Mae Harris retain separate counsel due to a conflict of interest, but her advice was disregarded. Each of these points merits discussion and the court will address them in order.

The essence of Glazer's first argument, as detailed in her January 19, 1988, motion and affidavit, is that her participation in this litigation ended shortly after trial began, thus, she was not involved in many of the hours identified by the court in its December, 1987, Opinion and Order. In this vein, her affidavit notes that upon graduation from Wake Forest University Law School in 1980 and admittance to the Bar that same year, Glazer joined the law firm of Chambers, Ferguson, Watt, Wallas & Adkins in Charlotte. Since this litigation was filed shortly thereafter, a significant amount of her time and energy was devoted to the case, under the direction of others, but that work ended only one month after trial began with the conclusion of Mattiebelle Harris' claims on February 17, 1984. *See* Trans., Vol. March 31, 1988, at

61–62. Subsequently, Glazer performed no work on the case except to prepare written summaries of her work product for internal office use. Glazer notes she did not participate in trial of the Sheppard or Blue claims, nor did she brief any matters at issue in those cases. In short, although she remained with the Chambers' law firm until July 1, 1984, her role in this case effectively ceased on February 17 of that year.

From these facts, which defendant does not dispute and the court has no reason to doubt, Glazer argues the sanctions against her are unjustified, unreasonable, and even if supported in theory, excessive. A review of the record and comments of Glazer's own counsel at hearing this spring lead the court to a different conclusion.

Taking Glazer's affidavit as entirely accurate, none of the points made diminishes Glazer's heightened and important pre-trial role in this case. As her counsel stated at hearing:

[Glazer's] motion is not predicated on the notion that Ms. Glazer had no responsibility for the proceedings. Ms. Glazer was an associate who was involved in this case almost as one of the first significant cases she ever worked on as a lawyer. . . .

But she did work and she spent a very significant part of her time on this case, and she was involved in aspects of the case which did concern [the court]. . . .

We disclaim any intention to say that she was not intimately involved in all of these proceedings, up to a point.

Trans., Vol. March 31, 1988, at 61–62. That being said, a brief review of Glazer's role in this case is in order.

Glazer worked on *Harris v. Marsh,* for well over two years. She was intimately involved in the pre-trial and day-to-day discovery phases of the case, perhaps more so than any of plaintiffs' counsel. Of the 175 depositions taken, Glazer was plaintiffs' only counsel for 54 and co-counsel for another 67. *Id.* at 108. Included in this

---

7. Counsel alleges the exhibit she wishes to complete in Court Exhibit No. 1. This exhibit contains only the initial July 17 "Final Agreement."

The exhibit counsel really refers to is Court Exhibit No. 2, plaintiffs' Verification and Approval forms.

latter category were the depositions of both Sandra Blue and Beulah Mae Harris. From an exhaustive review of the OPF's admitted at trial, each of which contains a disclosure accounting record, it is beyond cavil that Glazer was assigned or performed a dominant document review role for plaintiffs' litigation team. This included extensive work in both the Blue and Harris claims. *See, e.g.,* DX 201 (OPF of Blue) (Glazer reviewed on March 23, 1982); DX 820 (OPF in Harris claim) (reviewed by Glazer on March 25, 1982); DX 1101 (OPF of Ballew) (same).

Glazer appeared on behalf of plaintiffs at the December 8, 1983, final pre-trial conference and was a typed signatory on both final pre-trial orders. *See also* Trans., Vol. December 8, 1983, at 52. Her name appears on *numerous* pleadings and filings in this case from 1982 to the spring of 1984, including plaintiffs' December 16, 1983, Amended Complaint-in-Intervention (Tab 136), which contains specific listings of claims for relief by Beulah Mae Harris. *See also* December 8, 1983, Motion to Amend Harris' Complaint-in-Intervention. Counsel was similarly involved in briefing discovery matters and class certification issues. *See, e.g.,* Plaintiff's April 18, 1983, Motion for Class Certification, which contains numerous claims for relief by Blue and Harris; Plaintiff's June 1, 1982, Motion to Compel Discovery.

Thus, far from suggesting a minimal role in preparing and planning plaintiffs' case, including the claims of Blue and Harris, the record establishes Glazer as a primary pretrial actor. *See* Trans., Vol. April 1, 1988, at 46 (Glazer "practically lived at Ft. Bragg.") As this court found in its prior opinion, a number of major failings of counsel, resulting in the assessment of sanctions, occurred long before the individual claims of Blue came on for trial or those of Harris were voluntarily dismissed. *See, e.g., Harris v. Marsh,* 679 F.Supp. at 1378–80 (pre-filing and pre-trial investigation of claims wholly inadequate; statistical evidence never garnered on disparate impact claims; little or no effort made to sift through claims to determine potential merit; wholesale failure to digest and analyze materials provided in discovery). Given this combination of findings, the court rejects Glazer's argument that she should escape liability because her association with this case ended before the trial of Blue's claims.

From her extensive pre-trial work, Glazer was in a position to determine the merit or lack thereof of many of the claims filed at bar. Nothing in the record and no posttrial filing on her part suggests she ever argued against including any of the Blue or Harris claims in the final pre-trial orders or against proceeding to trial on these claims. In this regard, then, even if counsel's conduct failed to trigger the bad faith exception, it most definitely fell within the parameters of § 1927, Rule 11 and Rule 16. *Id.* at 1378–90. Accordingly, Glazer's motion to reconsider based on her limited trial role is DENIED.

■ Turning to counsel's second argument, that she received no notice of pending sanctions motions against her, the court finds this argument meritless as a matter of fact and law. First, defendant's motion for sanctions pertaining to the claims abandoned by Sandra Blue was filed on April 17, 1984, and the motion for sanctions against Beulah Mae Harris was filed on June 1, 1984. Both of these motions *expressly* requested fees and costs be assessed against plaintiffs *and their counsel.* Orders of the court were entered with respect to each motion in June of 1984, staying any action on the issue of sanctions until a later date. *See* Orders of June 1 and 8, 1984. The motions and orders were properly served on plaintiffs' counsel of record at their Charlotte law firm. *See* entries on docket sheet and certificates of service. By her own admission, Glazer remained associated with the firm until July 1, 1984. Thus, with respect to the sanctions at issue in this case, Glazer obviously received notice of defendant's motion. If, upon leaving the firm, counsel failed to receive notice of the 1985 sanctions hearings, fault lies with counsel and her former law firm, blame to be equally shared, *not* with defendant or this court.

■ Second, to the extent counsel argues notice to the law firm was not notice to her, such a proposition is patently without merit. If fifteen lawyers in a firm are working on the same case, nothing in the Rules suggests the court or opposing counsel must serve each lawyer individually with every filing in the case. Common sense and the realities of practice mandate that service on one counsel at the firm, presumably lead or senior counsel, suffices to notice all in the firm.[8] To require otherwise would staggeringly increase the costs of litigation in a prolonged or paper-oriented case.

■ Third, assuming *arguendo* that counsel was somehow deprived of adequate pre-hearing notice and an opportunity to be heard, providing for Glazer's motion to reconsider and the subsequent hearing on her motion rendered any such error harmless. *See Tom Growney Equipment, Inc. v. Shelley Irrigation Development, Inc.*, 834 F.2d 833, 835–37 (9th Cir.1987); *Donaldson v. Clark*, 819 F.2d 1551 (11th Cir.1987) (*en banc* ); *T.W. Electric Service, Inc. v. Pacific Electric Contractors*, 809 F.2d 626, 638 (9th Cir.1987). Counsel has been given ample oral and written opportunity to explain why sanctions should not issue against her. Any sanction now awarded against Glazer fully comports with all procedural due process requirements.

Accordingly, Glazer's motion to reconsider on the grounds of deprivation of procedural due process is DENIED.

Glazer next argues that as an associate, she necessarily relied on other lawyers senior to her at the firm when it came to questions of litigation procedure, strategy and tactics. Thus, counsel contends that if monetary sanctions are to be enforced in this matter, they should be assessed solely against lead counsel and her former law firm, both of whom are willing to shoulder the burden. Boiled down to its core, the gravamen of Glazer's defense is "I was only following directions." Although as a matter of practicality Glazer's view is not without some merit, fundamental notions of professional responsibility, ethical behavior, and fairness to all litigants demands rejection of her argument.

■ Counsel for both Glazer and Sumter forcefully argue in favor of a rebuttable, yet strong presumption against allocation of responsibility within a law firm for purposes of sanctions.[9] Pragmatic reasons support such a proposal. First, were allocation the rule rather than the exception, unseemly divisiveness between counsel undoubtedly would occur as each lawyer strived to defend his own position and decisions in the litigation. Second, the potential harm to associates in a law firm from allocation is obvious, as individualized assessment might well pit an associate, who follows instructions, against a partner, who issued the instructions, often leaving the associate in an untenable position.

Third, neither Rules 11 and 16 nor § 1927 require allocation. Further, to inquire into and disentangle specific intra-litigation team responsibilities in a complex lawsuit could easily lead to enormous satellite litigation; indeed, one could envision such proceedings routinely dwarfing the substantive litigation at bar in terms of time and costs. Such a scenario hardly fosters a healthy public respect for the Bar. Finally, counsel argue that both the deterrent effect and compensatory purpose sought through the imposition of sanctions can be accomplished by means of an opinion excoriating all the lawyers involved, but

---

8. Although the court was orally informed by plaintiffs' counsel sometime in the late spring or early summer of 1984 that Ms. Glazer was not returning to the litigation, no oral or written motion to withdraw as counsel of record was ever filed by Glazer and no order allowing such entered. Thus, under the Local Rules of Practice and Procedure for this district, Glazer remains counsel of record to this day. *See* Local Rule 2.07, E.D.N.C. ("No attorney whose appearance has been entered shall withdraw his or her appearance or have it stricken from the record except with leave of court.") Under these circumstances, hearing notices to plaintiffs' trial counsel in 1985 were and are reasonably imputed to Glazer.

9. Since the relationship between plaintiffs' counsel affects Sumter and Chambers' motions to re-allocate as well as the instant motion, the court includes facts relevant to all three motions in this discussion.

assessing any monetary sanction against the institutional entity only—the law firm —or lead (senior) counsel and the firm.

All of the above points are well taken and the court agrees that as a starting proposition, a rebuttable presumption against allocation among partners and associates for purposes of sanctions ought to be the general rule. However, to state the rule is to state the obvious—it is a *general* rule, not a *per se* one and the presumption is *rebuttable*, not conclusive. Thus, exceptions to the general rule exist and, even within the rule, the presumption may be rebutted by events or the unique nature of the proceedings. For the reasons which briefly follow, the court finds individualized assessment wholly appropriate in this case.

■ To suggest this case was extraordinary, both in its content and form, would barely be giving it the label it deserves. The court will not review the procedural background of this case yet again for that terrain has been thoroughly covered. But, it bears repeating that evidence was taken or argument heard for 93 days (trial and pre-trial), 256 witnesses testified, and 1,200 exhibits were admitted in a trial and subsequent sanctions hearing spread out over 1½ years. 679 F.Supp. at 1222. The litigation was the largest ever tried by the Department of the Army, with plaintiffs asserting and the Army defending nearly unlimited charges of discrimination, in terms of their geographic and legal scope. *Id.* The costs of the lawsuit, to both sides, were staggering and the time expended enormous.

The size and time consumed in this case, however, constitute only a minor factor to consider in determining whether to apply the general rule of allocation set forth above. Much more important, indeed decisive, is the conduct of counsel and their division of responsibility in the litigation.

In many multiple counsel cases, the general rule is easily applicable because all counsel appear at trial together and all counsel sign the relevant filings. Thus, inquiry into any division of responsibility is, for purposes of sanctions, unnecessary as the presumption of joint and several liability is a fair one. In other cases, lead counsel is dominant and assisting counsel plays such an obviously minor or subordinate role that assessment against lead counsel only is mandated. In still other cases, the misconduct leading to sanctions is solely attributable to just one lawyer, such as unprofessional conduct in the courtroom, and allocation is therefore irrelevant. The sins of one lawyer certainly may not be passed to another for guilt by association has no place in our legal system. Finally, cases arise where the numbers of counsel on one side of the aisle are so large and/or the division of responsibility so unclear from the record that to individually allocate sanctions would require massive and unjustified entanglement by the court in counsel's relationship with their client(s) and each other.

Unfortunately for plaintiffs' counsel, however, none of the above scenarios comes close to accurately describing their respective roles in this case. Instead, like a chameleon, which assumes whatever color it wishes as it passes through the color spectrum on the wall, plaintiffs' counsel changed *de facto* roles in this case almost on a daily basis. Some pleadings were signed only by Chambers, others by Chambers and Sumter, some by Sumter and Glazer, others by Sumter for Chambers, some by all three, and yet a number of others by Chambers, Sumter, Glazer, and Penda Hair. Until his motion on February 25, 1985, for permission to withdraw as lead counsel and the court's order granting said motion on February 26, 1985, Mr. Chambers technically served as "lead counsel" for plaintiffs. Yet, from February, 1984, forward, Chambers' actions hardly comported with that role. Chambers came in and out of the case as he wished. Some days Chambers attended trial, other days he was not present, and on still further occasions, he attended only part of the day. In his absence, Ms. Sumter acted as plaintiffs' trial counsel, early on with Ms. Glazer and Ms. Hair, later by herself, and subsequently, at sanctions hearing, with Ms. Gail Wright of the NAACP.

Further complicating matters was Chambers' assumption of the position of Director–Counsel of the NAACP Legal Defense and Educational Fund on July 1, 1984. Thus, *in the middle of the trial of Blue's claim*, Chambers left the Charlotte firm, assumed a new position, and relegated Sumter to the *de facto* role of lead and, for a time, sole counsel for plaintiffs.[10] In addition, as a matter of fact, Glazer and Hair left the litigation never to return in February and March, 1984, respectively, yet they never formally moved to withdraw as counsel, and their names, particularly Hair's, continued to appear on pleadings for months thereafter. *See* discussion *infra* at 220–21.[11]

In this regard, the following table shows just how often counsel visited this litigation:

| | Number of Trial Days Attended * | | | |
| | Chambers | Sumter | Glazer | Hair |
|---|---|---|---|---|
| January 1984 | 7 | 7 | 7 | 2 |
| February 1984 | 7 | 11 | 11 | 3 |
| March 1984 | 5 | 5 | 0 | 0 |
| April 1984 | 11 | 13 | 0 | 0 |
| June 1984 | 2 | 3 | 0 | 0 |
| August 1984 | 5 | 4 | 0 | 0 |
| September 1984 | 1** | 11 | 0 | 0 |
| February 1985 | 1** | 4 | 0 | 0 |
| March 1985 | 2 | 12 | 0 | 0 |
| April 1985 | 0 | 3 | 0 | 0 |
| July 1985 | 1 | 9 | 0 | 0 |
| | 42 | 82 | 18 | 5 |

** after 1:00 p.m. only

* This table does not include pre-trial and motions days.

Having stated all this, it might seem *Harris v. Marsh* exemplifies the need for joint and several liability. However, what the information really establishes is the need to avoid paper labels such as "lead" or "primary" counsel and focus instead on the reality of actual participation in the lawsuit. When one narrows in on this for·est through the trees, counsel's respective actions in this case generally can be articulated by time frame:

(1) *Pre-trial:* Chambers—senior counsel, with supervisory and final trial strategy authority; spokesman for the plaintiffs; Sumter—focused on trial preparation and briefing; Glazer—primary discovery counsel; Hair—subordinate role, relegated to minor briefing as well as witness preparation in one claim.

(2) *Trial* (January–February 1984): Chambers—primary trial counsel; Sumter—back-up trial counsel; Glazer—same; Hair—minimal and episodic role.

(3) *Trial* (March, 1984—March, 1985): Chambers—increasing diminished role in day-to-day trial of case; not involved in much of the litigation after April of 1984; Sumter—for all intents and purposes, assumes *de facto* role of sole trial counsel; Glazer and Hair—out of case (except on paper).

(4) *Sanctions Hearings* (March, 1985 —July, 1985): Chambers—no longer meaningfully involved in day-to-day decisions in case; visits litigation on long-distance basis; Sumter—shares co-counsel role with new (non-sanctioned) counsel Gail Wright.

Put in this perspective, it is apparent that Chambers, Sumter and Glazer played important, yet varying roles in the litigation at different times. Focusing on counsel's actual roles, and not their titles or position within the Charlotte law firm, individualized assessment of responsibility can be determined in this case with a fairly high degree of confidence and minimal speculation. This is all that is required; absolute

---

**10.** As if to highlight the court's point, Chambers' February 25, 1985, motion states in pertinent part:

Because of his present duties, the undersigned cannot attend each day of trial in this proceeding but does intend, with leave of Court, to attend *some* hearings and to take a *primary* role with respect to some of the plaintiffs and witnesses. (Emphasis added).

Query, based on this motion, how is the court to know when Chambers is "primary" counsel and when he is not? Does he come in and tell the court, "Today I'm 'primary' counsel, at least for witnesses A and B or claim C, but I'm not involved in witnesses D and E or claim F"? And, what is the court to do if the claims or testimony overlap?

**11.** The fact that Chambers left the law firm in the summer of 1984 and that Hair, a member of the NAACP Legal Defense Fund, was never a member of that firm makes assessment of substantial sanctions against the law firm only a difficult and somewhat unjustified proposition.

certainty as to each and every decision made by plaintiffs' counsel is not a pre-requisite to individualized sanctions.

This is not a case where all counsel can or should be lumped together for purposes of sanctions. Their roles varied with the time and scope of the lawsuit. Relevant to the egregious pre-trial and trial conduct identified by the court, each of plaintiffs' counsel was involved in some, but not all of those actions (indeed some of the conduct is solely attributable to the plaintiffs and not their counsel) and to different degrees. In sum, the court finds this is a unique case falling outside the general rule and one in which particularized deterrence is appropriate.

■ Having found, as a matter of fact, that individualized sanctions should issue, it follows that Ms. Glazer's "I was only an associate" defense must fail. Were this a case where Chambers, as senior partner, dominated the decision-making and trial of this litigation, a different result might well ensue for purposes of *monetary* sanctions.[12] Were this a case where Glazer played a wholly subordinate or episodic role, a different result might ensue.

In any event, being "only an associate" does not provide a lawyer with an impervious shield behind which counsel can hide from his or her mistakes. Associates may not blindly follow commands of partners they know to be wrong. Section 1927 requires that counsel not act negligently thereby proximately causing the filing or maintenance of a frivolous claim or defense and unnecessarily multiplying the proceedings resulting in an increase in the costs of litigation. Rule 11 requires a lawyer who elects to sign a paper take responsibility for it, even if that responsibility is shared. *Coburn Optical Industries, Inc. v. Cilco, Inc.,* 610 F.Supp. 656, 660 (M.D.N.C.1985). Neither § 1927 nor Rule 11 speaks in terms of associate and partner, "lead" or "primary" counsel, or foreign and local counsel,—the statutory language is cast only in terms of "counsel" or "an attorney." *See*

*Long v. Quantex Resources, Inc.,* 108 F.R.D. 416, 417 (S.D.N.Y.1985). No distinction is made and none may legitimately be read into either standard of conduct.

No lawyer may disclaim responsibility for his own actions or for a paper bearing his name. When others are involved in misconduct with counsel, degrees of culpability may vary but ultimate responsibility does not. *Coburn, supra.* Counsel simply cannot delegate to others their own duty to act reasonably and to meet the professional mandates set forth in Rule 11, Rule 16 and § 1927. *See Unioil, Inc. v. E.F. Hutton & Co., Inc.,* 809 F.2d 548, 558 (9th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987). The obligations imposed by law on attorneys do not fluctuate day to day or on a case by case basis.

In the end, each member of the Bar is an officer of the court. His first duty is not to the client or the senior partner, but to the administration of justice. *Coburn,* 610 F.Supp. at 661. Before filing and then pursuing a claim to trial, an attorney, by virtue of § 1927 and Rule 11, has an obligation to make certain the claim possesses a good-faith basis in fact and law. This responsibility, among many others, may not be passed blindly from one lawyer to another up the ostensible chain of command, with each lawyer claiming it was not his job to ultimately review that claim. When a cause of action is pressed to trial and it is determined to have been filed or pursued in bad-faith or without a reasonable basis in law and fact, all counsel involved in the processing and maintenance of the claim may be, in some degree, responsible. To hold otherwise would subvert the very essence of Rule 11 and § 1927. The doctrine of *respondeat superior* fails to absolve an associate from professional responsibility.

Applying these principles to Ms. Glazer's motion, the court finds its prior order correct and in accordance with law. The court took into account Ms. Glazer's background and experience relative to Mr. Chambers

---

12. For substantially the reasons which follow in text, this fact would make no difference in terms of imposition of a modest sanction, such

as reprimand, or for breach of any professional responsibility.

and it took into account her very limited trial role in that she was not involved in trying the *Blue* claims or dismissing the *Harris* claims. But it also considered counsel's primary discovery role and her access to much of the information plaintiffs possessed establishing the lack of merit in so many of the claims placed in the Final Pre–Trial Orders. The court further considered the number of pleadings and filings counsel signed and for which she therefore was, in part, responsible. The court also considered the great length of time available for counsel's investigation in this case, the resources available to counsel to determine the merits of her client's claims, and the fact that counsel has never indicated she had the slightest pre-filing or pre-trial reluctance to proceed with any of plaintiffs' claims.

Balancing all of the above concerns, the court finds the monetary sanction against Glazer of $5,000 to be reasonable, justified and not excessive. Accordingly, Glazer's motion to reconsider the assessment of this sum is DENIED.

 Finally, Glazer argues against the finding that she breached her ethical responsibilities via deliberate indifference to a continuing conflict of interest between two plaintiffs, Harris and Alicia Chisholm. Penda Hair moves to reconsider a similar finding against her. Although the court chooses to deal with the factual basis of Ms. Hair's motion later in this order, all attacks on the prior judgment as a matter of law will now be discussed.

The essence of counsel's legal attack on this court's finding of breach of ethical responsibility is that the determination was made without following the procedures set forth in the "Disciplinary Rules" adopted by this district in August of 1980. The "Rules" set forth a fairly detailed set of guidelines for the conduct of different types of disciplinary proceedings. Hair specifically argues that Rule 105.00 was not followed. This rule states:

RULE 105.00 DISCIPLINARY PROCEEDINGS.

105.01: *Referral By The Court.* When misconduct or allegations of mis-

conduct on the part of an attorney admitted to practice before this court which, if substantiated, would warrant discipline of such attorney shall come to the attention of a judge of this court, whether by complaint or otherwise, and the applicable procedure is not otherwise mandated by these Rules, the judge shall refer the matter to counsel for investigation and, if warranted, the prosecution of a formal disciplinary proceeding or the formulation of such other recommendation as may be appropriate.

105.02: *Recommendation for Disposition.* Should counsel conclude after investigation and review that a formal disciplinary proceeding should not be initiated against the respondent-attorney because sufficient evidence is not present, or because there is pending another proceeding against the respondent-attorney, the disposition of which in the judgment of the counsel should be awaited before further action by this court is considered or for any other valid reason, counsel shall file with the court a recommendation for disposition of the matter, whether by dismissal, admonition, deferral, or otherwise, setting forth the reasons therefor.

105.03: *Initiation of Disciplinary Proceedings.* To initiate formal disciplinary proceedings, counsel shall obtain an order of this court upon a showing of probable cause requiring the respondent-attorney to show cause within 30 days after service of that order upon that attorney, personally or by mail, why the attorney should not be disciplined.

105.04: *Procedure for Hearing.* Upon the respondent-attorney's answer to the order to show cause, if any issue of fact is raised or the respondent-attorney wishes to be heard in mitigation this court shall set the matter for prompt hearing before one or more judges of this court, provided however that if the disciplinary proceeding is predicated upon the complaint of a judge of this court the hearing shall be conducted before another judge of this court appointed by the Chief Judge, or if the Chief

Judge is the complainant, by the next senior judge of this court.

Hair claims her case should have been referred to independent counsel for investigation under Rule 105.01, that a recommended disposition should have been entered by said counsel pursuant to Rule 105.02, that a formal order initiating disciplinary proceedings under 105.03 should have issued, and that a 105.04 hearing should have taken place. Since none of the above occurred, Hair claims a violation of due process of law.

The short and dispositive answer to counsel's argument is that the discipline imposed in this case was not contemplated by nor does it come under the auspices of Rule 105.00. That rule was designed to deal only with situations in which the alleged unethical conduct comes to the court's attention from some external source. *See* Rule 105.01. Indeed, Rule 112.00 specifically provides that "[n]othing contained in these Rules shall be construed to deny to this court such powers as are necessary for the court to maintain control *over proceedings conducted before it ...*" (emphasis added).

Here, the court plainly possessed first-hand knowledge of the actions of counsel relating to the unethical conduct at issue. Just as the court has inherent authority to summarily find a party in contempt for conduct occurring in its presence without a formal hearing, *see* Fed.R.Crim.P. 42(a), the Local Rules impliedly contemplate similar authority with respect to litigation discipline. *See Fisher v. Pace,* 336 U.S. 155, 159–60, 69 S.Ct. 425, 427–28, 93 L.Ed. 569 (1949) (summary contempt conviction of attorney for actions in the court's presence does not violate due process). And, there can be little doubt concerning the court's inherent authority to control the litigation and parties before it. *See, e.g., Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973).

In addition, plaintiffs' counsel were long on notice of both defendant's and this court's heightened concern with respect to the Harris–Chisholm conflict. The matter was raised in open court, along with other

potential conflicts, as early as August 22, 1983. The court was repeatedly informed that the conflict was resolved when, in reality, it never was nor could it reasonably ever have been.

Finally, to the extent imposition of the original reprimand and fine violated any due process right of counsel, by providing for reconsideration and seriously entertaining counsel's arguments, due process requirements of notice and an opportunity to be heard have now been satisfied. Nothing more could be gained by re-opening this issue yet again to a further round of hearings and no party has suggested such an alternative. In fact, neither Chambers nor Sumter moved to reconsider this finding in any manner.

 Thus, as a matter of law, the court holds its finding of breach of professional responsibility may be enforced against counsel as previously determined. However, factually, Ms. Glazer makes a sound and uncontested argument. In her January 19, 1988, Affidavit, Glazer states that in the fall of 1983, she recommended to her colleagues in the law firm that Chisholm retain separate counsel. Her recommendation was not followed. Affidavit at 3–4. No one disputes Glazer's affidavit. Furthermore, since Glazer left the litigation in early 1984, she was not present when defendants oft-repeated their concerns of conflict to plaintiffs' counsel in 1985.

These two facts, taken in combination, cast Glazer's conduct in a different light than that of Chambers and Sumter. Although Glazer unreasonably signed the Pre–Trial Order which included the conflicting claims and further signed an October 10, 1983, "Supplemental Report" (Tab 123) purporting to resolve the conflict, the court cannot in good conscience impose any finding of breach of ethical responsibility on Glazer. She was wrong to sign the documents knowing the existence of a conflict of interest, but at least she acted internally on these beliefs, which is more than can be attributed to her more experienced counterparts. Thus, although reasonable counsel would have recognized and appropriately responded to the Harris–Chisholm conflict

before August 31, 1983, and, therefore, Glazer's post-August conduct technically may well have amounted to a breach of responsibility, the court, in its discretion, GRANTS Glazer's motion to reconsider, REVERSES its prior finding of breach of professional ethics and VACATES the prior reprimand and $250.00 fine.

In sum, with the exception of the above paragraph, Glazer's motion to reconsider is DENIED.

## IV. *Penda Hair's Motion to Reconsider*

Pursuant to Fed.R.Civ.P. 60(b), Ms. Hair moves to vacate the sanctions imposed upon her and the finding of breach of professional responsibility contained in the court's previous order. If granted, Hair further moves to strike all references to such sanctions from the opinion and corresponding judgment. From credible evidence adduced at the March 31, 1988, hearing and a review of the record, the court issues the following

## FINDINGS OF FACT

1. Beginning in late 1982, Hair held a tenure track position as an assistant professor of law at Columbia University School of Law. Her arrangement with the law school was to spend approximately one-half her time working for the NAACP Legal Defense Fund (LDF).[13] January 19, 1988, Affidavit of Penda Hair at 2.

2. In July, 1983, LDF assigned Hair to assist Julius Chambers in *Harris v. Marsh.* When she began work on the case, Hair was the most junior staff attorney with LDF. During her participation in the instant litigation, Hair held no supervisory position at LDF and exercised no such responsibilities. *Id.* at 3.

3. Because of Hair's teaching obligations and other LDF responsibilities, her participation in the case *sub judice* was extremely limited and episodic. She undertook only relatively minor and defined tasks. No individual plaintiff's case was assigned to Hair. She possessed no decision-making authority or responsibility for the day-to-day management of the case. *Id.* at 3–4.

4. However, Hair did sign the Final Pre–Trial Orders entered in this case and a plethora of pre-trial pleadings and filings. *See, e.g.,* Plaintiffs' January 23, 1984, Proposed Findings of Fact and Conclusions of Law; Plaintiffs' January 23, 1984, Order of Witnesses; Plaintiffs' January 20, 1984, Response to Defendant's Motion *In Limine;* Plaintiffs' December 16, 1983, Amended Complaint-in-Intervention; Beulah Mae Harris' December 8, 1983, Motion to Amend; Plaintiffs' October 10, 1983, "Supplemental Report" on conflicts.

5. Hair conducted no factual investigation of plaintiffs' claims and she did not participate in counsel for plaintiffs' decisions regarding which claims to pursue and which to abandon. *Id.* at 4.

6. Hair's substantive role in this case was limited to *four* types of assistance to Chambers, exclusive of general background reading and ministerial tasks:

 (a) researching, drafting legal memoranda and arguing particular issues of law;

 (b) consulting on the possible use of "pattern and practice" statistical evidence;

---

**13.** LDF is a non-profit corporation established for the purpose of assisting black citizens in securing their constitutional and civil rights. It is independent of other organizations. January 18, 1988, Affidavit of Jack Greenberg at 1–2. One of the primary ways LDF pursues its mission is through litigation. The litigation effort is not conducted by staff attorneys alone. Rather, in a large number of cases, primary responsibility for cases LDF supports is placed in the hands of private "cooperating attorneys." These are counsel in private practice or law schools who, as part of their work, participate in LDF cases. *Id.* at 2.

In many cases, LDF takes primary responsibility for the lawsuit and an LDF staff attorney serves as "lead counsel"; in other cases, however, LDF simply provides monetary support and/or limited staff assistance. *Id.* Thus, in this latter series of cases, LDF functions as a backup resource, providing legal research and focusing on discrete litigation tasks. This is the role Hair was assigned and performed in the instant litigation. *Id.* at 3.

(c) assisting with the presentation of the claim of Mattiebelle Harris; and

(d) preparing Pre–Trial Order material related to the federal personnel system generally, as well as attending the December 8, 1983, Pre–Trial Conference.

*Id.*

7. Hair began her work in this case on July 23, 1983, reviewing general information sent her by Chambers. Later in July, she labeled exhibits and participated in client interviews with plaintiff Loftin and intervenor Robinson. *Id.* at 5.

8. In August, 1983, Hair briefed issues of exhaustion of administrative remedies and tolling as well as discovery of defendant's computer tapes. *Id.* at 5–6. All of this work was forwarded to Chambers ·for editing and filing. Hair conducted no independent factual investigation with respect to any memorandum of law; she relied *exclusively* on Chambers and his associates. *Id.* at 6.

9. In August, Hair also provided Chambers with general information as to federal personnel system for inclusion in the Final Pre–Trial Order. *Id.* In addition, Hair reviewed "pattern and practice" statistical evidence with plaintiffs' expert and Chambers. She prepared no statistical evidence for any individual case and did not decide whether or how to use such evidence. *Id.* at 7.

10. From September 29, 1983, to December 7, 1983, Hair expended no time on this case. Her next activity was participation in the Final Pre–Trial Conference on December 8, 1983, in Wilmington. She was asked by Chambers to attend this conference at the last minute and, therefore, could not prepare for the conference. *Id.* at 8. Although Hair signed both Pre–Trial Orders, she had little, if any, idea of the contents of the orders. The same is true with respect to most of the pleadings and filings upon which her name appears.

11. In January, 1984, Hair spent those days on which she was not teaching at the trial of Mattiebelle Harris' claims in Fayetteville. Her participation at trial was minimal, consisting of some witness preparation and evidentiary research. *Id.* at 9. The same is generally true for Hair's participation in February, although she did conduct the direct examination of three witnesses for Chambers, who could not be present for trial on February 2, 1984. Among these witnesses was Beulah Mae Harris; however, this examination lasted less than two minutes. *Id.* at 9–10.

12. In March, 1984, Hair conducted basic research on burdens of proof in Title VII cases and read plaintiffs' expert's deposition. At that point, LDF decided to terminate its involvement in *Harris v. Marsh.* This decision was communicated by Jack Greenberg, LDF's Director–Counsel, to Chambers. *Id.* at 10. Chambers subsequently told Hair that he informed the court that Hair would no longer be participating in the case. *Id. See also* Trans., Vol. March 31, 1988, at 130; 171–72. Such information was *never* passed on to this court. Hair filed no formal motion, request or notice of withdrawal.

13. Despite the fact that LDF and Hair withdrew from the case at bar, in a *de facto sense,* in March of 1984, Hair's typed signature continued to appear on nearly every filing by the plaintiffs through the end of June, 1984. *E.g.,* June 29, 1984, Proposed Findings of Fact and Conclusions of Law for the Claims of Robert Evans and Mitchell McKeller; Plaintiffs' June 26, 1984, Amended Submission of List of Plaintiffs and Intervenor–Plaintiffs who Wish to Pursue Their Claims; Plaintiffs' June 14, 1984, Response to Order of Court; Plaintiffs' June 13, 1984, Proposed Findings of Fact and Conclusions of Law for Mattiebelle Harris and Samuel Sheppard; Plaintiffs' June 8, 1984, Response to Defendant's Motion for Stay of Processing of Canady Intimidation Charge; Plaintiffs' June 1, 1984, Brief in Support of Admissibility of Exhibits. *See also* Trans., Vol. March 31, 1988, at 131–33.[14]

---

**14.** Thus, at the time the court entered its prior opinion it had every reason to believe Hair was

very active in this litigation well into the sum-

In this regard, Hair testified she had no idea her signature appeared on any filing in the case after March, 1984. Indeed, Hair was visibly shaken when confronted with this information and the filings. Chambers and Sumter had no authorization to place Hair's signature on any of these documents. *See id.* at 158–60.[15]

14. In sum, more than any other counsel in the litigation, on either side, Hair played a tangential, subordinate and minimal role in the development and trial of the case. Hair was not involved in the Blue or Beulah Mae Harris claims nor was she truly aware of the Harris–Chisholm conflict, except through her appearance at the August 22, 1983, hearing where the issue was discussed by defendant's counsel and the court.[16]

■ From the above findings of fact, the court concludes that despite being remiss with respect to signing filed documents, the contents of which counsel

knew nothing about, Ms. Hair is entitled to have all monetary sanctions against her vacated and any finding of "bad-faith" stricken. Hair's actual role in this case was obviously a subordinate one. She relied totally on her Charlotte co-counsel for all facts related to the narrow issues assigned her by Chambers. With rare exception, Hair's minimal participation focused on legal issues in the case and her work rarely brought her into contact with the Blue and Harris claims. She generally was not involved in discovery, witness preparation, or any manner of trial strategy. Her true role was strictly that of a back-up legal resource for plaintiffs' trial counsel. In sum, fairness suggests Hair should not be held liable in a monetary sense for the harm inflicted by plaintiffs on defendant and society.

■ Notwithstanding these comments, the court DENIES counsel's motion to strike the prior finding that counsel violated Rule 11, for this she did on a veritable

mer of 1984. *See* Trans., Vol. March 31, 1988, at 133–34.

15. In many respects, the actions, or the lack thereof, by Hair's co-counsel in signing or allowing her name to be added to the signature block of so many filings after LDF withdrew Hair from the case, exemplifies counsel's conduct in this litigation. More than a mere clerical error occurred here. Sumter and Chambers continually signed motions and briefs over Hair's name, apparently without giving it the slightest thought. And, as a result of their irresponsibility, Penda Hair personally suffered as did her professional reputation.

As previously alluded to, this was far from the first time plaintiffs' counsel played fast and loose with the facts and the rules. As early as the first day of trial, plaintiffs' counsel were brought into chambers on request of defendant to discuss the fact that counsel had issued numbers of out of jurisdiction subpoenaes. Counsel admitted the subpoenaes were invalid, but argued, in essence, that they were necessary to dupe the prospective witnesses' employers into allowing the witnesses to leave work and attend trial.

On another occasion, Mr. Chambers indicated a prospective witness from Florida, one Col. Estaban Beruvides, was too ill to attend trial and, therefore, requested the court allow Beruvides' deposition be taken out of turn and placed into the record at a later date. Defendant strenuously contested counsel's motion and seriously questioned Beruvides' medical condition. Trans., Vol. February 7, 1984, at 6–10.

When the court's staff telephonically inquired into the witness' status, Beruvides indicated that the week previous he had been contacted by Sumter and had indicated to her that he was ill with a fever. Sumter promised to check on his status after she conferred with the court, but she never called Beruvides again. By the date Beruvides was to testify, six days later, he had recovered and, in fact, was leaving on a trip with his brother. *See* Clerk's February 8, 1984, Affidavit.

Yet another time, during sanctions hearing, Sumter and then co-counsel Gail Wright informed the court that the reason plaintiff Violet Henderson could not be in court on the date of her hearing was because Henderson was in Copenhagen, Denmark and *all flights* out of the country were cancelled due to a workers' strike. Trans., Vol. March 29, 1985, at 7. Counsel for defendant were not satisfied with plaintiffs' explanation and, within hours, had determined that four airlines were operating out of Copenhagen with little or no curtailment of service: KLM Royal Dutch Airlines, TWA, Lufthansa, and Northwest Airlines. *See* March 29, 1985, Declaration of Stephen Berry; Trans., Vol. March 29, 1985, at 7–31.

Taken in isolation, each one of the above actions or representations is questionable; considered synergistically, they are profoundly disappointing.

16. Hair testified she relied on Chambers' pretrial comment to her that all potential conflicts were resolved. Trans., Vol. March 31, 1988, at 165–66.

host of pre-trial filings, including the Final Pre-Trial Orders. Counsel's actions may well be characterized as ones of youthful ignorance, but that hardly qualifies as a defense to Rule 11. *See Harris v. Marsh,* 679 F.Supp. at 1384–87. By her own admission, counsel signed documents without conducting the first independent factual inquiry into their basis and without any knowledge of much of what was contained in the filings. Blanket reliance upon co-counsel on such a grand scale is presumptively unreasonable. *See Unioil, Inc. v. E.F. Hutto & Co.,* 809 F.2d at 558.

The court is not suggesting counsel may not play a limited role in major or protracted litigation, but counsel appearing in such a capacity must (1) make their limited appearance formally and specifically known to opposing counsel and the court and (2) counsel may not extend their efforts beyond the dividing line of their own creation. That is to say, once counsel limits their appearance to litigation on claim A, they may not blindly sign pleadings and filings relevant to other claims. To do so under Rule 11 represents the height of folly and any sanctions subsequently assessed are rightfully earned. Under Rule 11, the obligation to answer for one's act accompanies the act; a lawyer cannot absolve himself of responsibility after he signs a pleading or document by claiming his role in the litigation or with respect to that filing was minor. That simply is no defense to a filing not well grounded in fact or warranted by existing law.

In short, Rule 11 applies to pleadings, motions and papers signed by an attorney, regardless of his capacity. If the filing violates Rule 11, sanctions are mandatorily assessed against all who signed the paper. Thus, counsel must be selective in the documents they sign. *Robinson v. National Cash Register,* 808 F.2d 1119, 1129 (5th Cir.1987). Where responsibility for litigation is divided among several lawyers or law firms, counsel would be well advised to have only the attorney(s) responsible for the contents of the document sign it. *Id. See also Balfour Guthrie, Inc. v. Hunter Marine Transport,* 118 F.R.D. 66, 73 n. 21 (M.D.Tenn.1987). In this manner, counsel are protected and the need for satellite litigation over who exactly was responsible for a particular filing is alleviated. *Robinson,* 808 F.2d at 1129.

Accordingly, for the reasons set forth above, Hair's motion to reconsider as to the imposition of monetary sanctions and the finding of "bad-faith" is GRANTED.[17] In the court's discretion, the same is true with respect to the § 1927 finding as, in reality, no act of Hair unnecessarily multiplied these proceedings. Counsel's motion is, however, DENIED as to the finding of a violation of Fed.R.Civ.P. 11 and counsel is urged to introspect the reckless manner in which she signed pre-trial documents lacking a good-faith legal or factual predicate.[18]

■ As for the breach of responsibility finding, for many of the same reasons heretofore cited, although counsel was remiss in signing filings suggesting (1) resolution of the conflict and (2) alleging conflicting claims for trial, the court holds counsel's conduct does not rise to the level of culpability necessary to fairly find counsel guilty of an ethical violation. Therefore, counsel's motion to reconsider is GRANTED, the court's prior finding of

---

**17.** In the court's discretion, the $5,000 originally assessed against Hair is *not* re-allocated among remaining counsel. Deterrence does not require re-allocation and the goal of compensation for defendant is not compromised as it is ORDERED the $5,000 be taken solely from the amounts plaintiffs' counsel owed the court, *i.e.,* to reduce, proportionately, the court costs assessed in the *Blue* and *Harris* claims (originally $24,580.00 and $6,325.00, respectively).

**18.** Counsel's objection that she failed to receive notice of defendant's pending sanctions motions is OVERRULED for as counsel of record, not having formally withdrawn, Hair remained in this case until judgment entered, and blame for lack of notice lies solely at the doorstep of co-counsel Chambers, Sumter and Wright. *See* Local Rule of Practice and Procedure 2.07, E.D. N.C. Furthermore, to the extent any due process concerns arise with respect to the court's December, 1987, Opinion, the post-judgment opportunity for reconsideration and hearing provided to counsel—of which she took advantage—as well as this order, militate strongly against the continued validity of any such claim.

breach is REVERSED and all sanctions in this regard are VACATED.

### V. *Julius Chambers' and Geraldine Sumter's Motions to Reallocate Sanctions*

While Mr. Chambers does not concede that the sanctions imposed by the court were proper, as former "lead" counsel, he accepts "ultimate responsibility" for the conduct of this litigation and, as such, now requests all monetary sanctions be re-allocated and assessed against him personally. Ms. Sumter joins in Chambers' motion. Although the court understands and commends the spirit behind Chambers' noble gesture, accession to counsel's request would (1) ignore the realities of counsel for plaintiffs' actual participation in the litigation and (2) fail to serve the purposes sought to be accomplished by the imposition of sanctions directly against the offending attorneys.

First, as thoroughly outlined in the court's prior opinion and as supplemented in this order, the conduct of Ms. Sumter was far from sterling in this case. As trial counsel for much of the litigation, particularly Blue's claims and the sanctions hearings regarding both plaintiffs, a significant amount of the reckless, vexatious and frivolous conduct of plaintiffs is fairly laid to rest at Sumter's doorstep. In addition, as of February, 1985, Sumter took on the role Chambers once fulfilled, "lead" counsel for the litigation. Why Chambers should be assessed for misconduct that occurred when he was not present at the site of trial and was no longer acting in a supervisory capacity for the litigation is not at all clear to the court. *See,* Trans., Vol. March 31, 1988, at 13–14.

Second, even were the court inclined to allow Chambers to shoulder the burden he seeks to bear, shifting the full amount of sanctions to Chambers is not justified in light of the purposes underlying the bad-faith exception, § 1927, Rule 11 and Rule 16. To place the entire monetary obligation on Chambers, when it is clear other attorneys played significant roles and were partly at fault in the extraordinary mismanagement of this case would seriously contravene the deterrent and constructive effect the sanctions were intended to have on all offending parties. Associate counsel have an *independent* responsibility to avoid frivolous, vexatious and harassing litigation. Counsel have an *individual* obligation to act in good faith and conformity with the Rules. When counsel violate rules of litigation conduct, a price must be paid.

In the end, allowing Chambers' motion would not affect the court's judgment in a compensatory sense. But, compensation is not the only purpose underlying the bad-faith exception, § 1927 and Rule 11. An even more important purpose is deterence. *See Brown v. Federation of State Medical Boards of the United States,* 830 F.2d 1429, 1438 (7th Cir.1987); Advisory Committee Note, 97 F.R.D. 198, 200 (1983). The monetary sanctions assessed *sub judice* were intended to deter specifically as to each lawyer and generally as to the public and Bar. They were formulated with great care and attention to detail in an effort to constructively discourage the type of gross misconduct that permeated this lawsuit. Nothing would be gained and much lost by the wholesale re-allocation of sanctions suggested by counsel. *See Thomas v. Capital Security Services, Inc.,* 836 F.2d 866, 877 (5th Cir.1988) (*en banc*).

Accordingly, Chambers' and Sumter's motion for re-allocation are DENIED.[19]

### VI. *Defendant's Motion for Additional Sanctions in the Case of Sandra Blue*

In the court's prior opinion, it granted most of defendant's fee and cost application as it related to claims that were aban-

---

**19.** Although the court publicly and formally denies re-allocation, nothing prohibits Mr. Chambers, should he choose to do so, from altruistically reimbursing Ms. Sumter and Ms. Glazer. As defense counsel suggested at argument, this is not prohibited by the order because, in reali- ty, such an order would be unenforceable. The court is not in the business of policing the private lives and personal decisions of attorneys that practice before it. Although the court believes reimbursement unwise for the reasons cited above, for the record, it is not precluded.

doned by Sandra Blue. And, with respect to the claims Blue tried on the merits, the court found all of those claims vexatious and frivolous. However, since defendant never formally moved for fees and costs with respect to the tried claims, the court declined to award expenses *sua sponte.* Instead, defendant was allowed 20 days from the date of service of the court's opinion to file a fee request for the tried claims in *Blue. Harris v. Marsh,* 679 F.Supp. at 1315 n. 173.[20] Defendant has promptly done so and that is the essence of the instant motion.

As Chambers' response to defendant's motion suggests, the court's prior opinion fully supplies the legal predicate for imposition of additional sanctions as a result of Blue's trial. Chambers' February 16, 1988, Memorandum in Opposition to Defendant's Motion for Additional Sanctions at 1. ("On [defendant's motion], however, the only issue is the reasonableness of the defendant's fee request.") No purpose would be served by repeating the court's prior findings, and citation to the pages on which they can be found follows. *Harris v. Marsh,* 679 F.Supp. at 1287–1311, 1378–80, 1383–84 and 1387–88.

From a review of defendant's motion and affidavits, plaintiffs' general opposition and the record, the court makes the following

### FINDINGS OF FACT

1. Defendant's present request for costs, expenses and attorney's fees encompasses only those times which can definitively be ascertained from trial records and previously filed affidavits or declarations. Thus, defense counsel and litigation team members claim time solely for hours expended at trial and for out-of-court time on MPAs 273–79 and 303–79. Defendant waives all potential sanctions for the remainder of Blue's tried claims. This decision was made by defendant because coun-

sel and support personnel could no longer, in good conscience, reconstruct their time from 1981–1984.

■ 2. Peter Loewenberg seeks compensation for 16 hours and 43 minutes attributable to trial preparation for the two MPAs. January 19, 1988, Affidavit of Loewenberg at 4. *See also Harris v. Marsh,* 679 F.Supp. at 1330. Counsel further seeks reimbursement for the 72 hours expended at trial. Affidavit, *supra.* Finally, counsel requests compensation for trial preparation during the course of the trial at the rate of 2 hours per day for 5 days and 1 hour per day for 6 days for a total of 16 hours. *Id.* at 45. Thus, the total number of compensable hours claimed by counsel is 104.43. *Id.* At the previously determined rate of $75 per hour, defendant therefore seeks an additional $7,832.25 from plaintiffs for Loewenberg's time.[21]

3. As with defendant's entire supplemental fee petition, no objection was filed by either plaintiffs or their former counsel to the hours requested by defendant. Given this lack of objection and the clear support for Loewenberg's request in the record, the court finds Loewenberg's application eminently reasonable in terms of the hours claimed.

Plaintiffs' opposition to defendant's motion rests with the hourly rates proposed by counsel and utilized by the court in its prior opinion. For ease of analysis, the court will complete the task of issuing findings on the hours claimed by defendant and will conclude its discussion of defendant's motion with an analysis of plaintiff's rate objection.

■ 4. Stephen Berry, now a resident associated in the Los Angeles law firm of Paul, Hasting, Jenofsky & Walker, seeks compensation for (1) 72 trial hours, (2) 21½ hours of out-of-court trial preparation time on trial days and (3) 30 hours of legal

**20.** The court did, however, impose its own costs for the trial of Blue's claims on plaintiff and her counsel. *Harris v. Marsh,* 679 F.Supp. at 1324–26 and 1392. For additional authority supporting the court's determination, *see Lapin v. United States,* 118 F.R.D. 632, 645–46 (D.Hawaii 1987) ($15,600 award on 78 hours × $200).

**21.** Exercising reasonable billing judgment, Loewenberg waives all costs for travel and *per diem* while at and en route to trial. *See Harris v. Marsh,* 679 F.Supp. at 1328.

research for drafting defendant's proposed findings of fact and conclusions of law following trial in the *Blue* case. January 19, 1988, Affidavit of Berry at 3–4. *See also Harris v. Marsh,* 679 F.Supp. at 1333 n. 210. Using the $75 per hour figure previously assessed, Berry requests a total award of $9,262.50 (123½ hrs. × $75). Affidavit of Berry at 4. Berry also seeks reimbursement for $686.00 in travel and *per diem* expenses for the government. *Id.* at 5.

5. Although plaintiffs have not objected to Berry's request, since Loewenberg conducted the entire trial of Blue, the court finds it unreasonable to assess plaintiffs any more in fees and costs than Loewenberg saw fit to request. Therefore, in its discretion, the court reduces Berry's request for fees to $7,832.25 and eliminates counsel's cost request. *See* cases cited in *Spell v. McDaniel,* 616 F.Supp. 1069, 1095 (E.D.N.C.1985), *aff'd in relevant part,* 824 F.2d 1380 (4th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988) for the proposition that percentage or across-the board reductions amount to a viable means of eliminating any unreasonable duplication or excessiveness in hours.

■ 6. As for members of the defense litigation team, Ruth Crumley seeks compensation for 72 trial hours,[22] Sue McKenzie requests reimbursement for 72 trial hours, 8 hours of trial preparation during trial and 178 hours for associated pre-trial tasks relating to the Blue claim for a grand total of 258 hours,[23] and Ann Endfinger requests compensation for 72 trial hours.[24] Thus, in sum, defendant claims a litigation team expenditure of 402 hours at $25 per hour.

7. Although there is no doubt the hours claimed above were truly expended and quite probably vastly underestimate the actual number of hours spent by the litigation team on Blue's claims, there is also no question the trial hours claimed are duplicative and excessive. Defendant may honestly have felt it needed all three staff members in the courtroom at the same time, but the exercise of reasonable billing judgment suggests no principled basis upon which to tax plaintiff and her counsel with those costs. Reduction is warranted where staff members unreasonably duplicate each other's work. *Spell,* 616 F.Supp. at 1093. Here, in court, McKenzie, Endfinger and, to some extent, Crumley, patently fall within that category. Thus, the court reduces defendant's request by 108 hours: 72 for Endfinger and 36 for Crumley. All other hours were reasonably expended and charged.

Accordingly, defendant is entitled to reimbursement in the amount of $7,350 (294 hours × $25) for time expended by the litigation team.

■ 8. Having considered defendant's request, were the rates previously used to be applied here, defendant's additional claim for sanctions would total $23,014.50.

Turning now to the thrust of plaintiff's attack on defendant's additional request for fees, plaintiffs contend that the hourly rates of $75 for counsel and $25 for litigation team members are excessive because they erroneously assume the government is entitled to recover private market rates for services of its employees when, in fact, the government's costs are substantially less than the private sector.[25] As such, the

---

22. During trial, Crumley contacted witnesses, made motel arrangements and plane reservations, arranged for travel advances, coordinated litigation team and witness logistics and copied documents. In addition, from August 27, 1984, to September 4, 1984, Crumley took trial notes for the defendant. *See* January 20, 1988, Affidavit of Crumley at 1–2.

23. During trial, McKenzie was present in the courtroom the entire time and functioned as primary assistant to Loewenberg. She identified potential issues, located and pulled exhibits, reviewed documents and depositions, pulled

witness notes, and advised counsel on contradictions in witness testimony relative to their prior statements. In off-hours, McKenzie prepared and arranged exhibits. *See* January 20, 1988, Affidavit of McKenzie at 1–2.

24. During trial, Endfinger's primary responsibility was to assist Berry. Her tasks mirrored those of McKenzie for Loewenberg. *See* January 20, 1988, Affidavit of Endfinger at 1.

25. Plaintiffs concede that in the private sector, defendant's proposed rates are entirely reasonable. Trans., Vol. April 1, 1988, at 18.

argument continues, fee awards to the government should be based solely on the *salaries* actually *paid* to counsel and their staff by the government. Some lower court authority exists for this proposition. *See In re Trinity Industries, Inc.,* 674 F.Supp. 337, 340–41 (M.D.Fla.1987) (salary costs at hourly rate provide reasonable basis for valuing time of government lawyers in civil contempt proceeding); *United States Postal Service v. Columbia Research Corp.,* 87 F.R.D. 395, 397 (N.D.Ill. 1980) (same); *United States v. Greyhound Corp.,* 370 F.Supp. 881, 886 (N.D.Ill.), *aff'd,* 508 F.2d 529 (7th Cir.1974) (same). This court, however, strongly disagrees.

No one doubts that the overriding goal in calculating a pre-mitigation award of attorney's fees, be it under § 1988 or in the context of sanctions, is to arrive at a figure that reasonably reimburses the moving party its actual costs expended. The case at bar raises the interesting question of how to accomplish this task when counsel are government lawyers who do not operate in the "prevailing" private market. For the reasons which follow, the court holds that its prior calculation of fees was correct and that it did not apply the wrong legal standard by employing a general prevailing "market rate" analysis rather than defense counsel's actual hourly salary.[26] In reaching this conclusion, the court relies on analogous Supreme Court authority and the reality of the cost of legal services to the government.

The most apposite case on attorney's fees is *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In *Blum,* a unanimous Court rejected the petitioner's argument that non-profit legal organizations with salaried attorneys deserved only their litigation costs because awarding market rates would constitute a windfall for such organizations. The Court held that even though counsel for the Legal Aid Society for New York would not have received a fee from their clients, they nevertheless were entitled to a fair market rate under fee shifting statutes. *Id.* at 892–94, 104 S.Ct. at 1545–47. It held that reasonable awards under such statutes "are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or non-profit counsel." *Id.* at 895, 104 S.Ct. at 1547.

Although *Blum* dealt with an award to plaintiffs' counsel under a fee-shifting statute, 42 U.S.C. § 1988, the Court's holding is clearly not limited to the facts of the case. *See, e.g., Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). The gravamen of *Blum* is that absent extraordinary circumstances, market rates ought to be employed in calculating all awards of attorney's fees. *See, e.g., Student Public Interest Research Group v. AT & T Bell Laboratories,* 842 F.2d 1436 (3d Cir.1988) (community market rate the appropriate measure for attorney's fees awarded to a public interest law firm that uniformly charged clients rates dramatically lower than market rate); *Sierra Club v. Environmental Protection Agency,* 769 F.2d 796, 809 (D.C.Cir.1985) (non-profit law firm without ordinary billing rates entitled to prevailing market rates); *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945 (1st Cir.1984) (law professors awarded market rates); *Burney v. Housing Authority of Beaver,* 735 F.2d 113, 116 (3d Cir.1984) (remanded for reconsideration of market rates for public legal services lawyers); *Coleman v. Block,* 589 F.Supp. 1411, 1416 (D.N.D.1984) (non-profit law offices get market rate); *Piljan v. Michigan Department of Social Services,* 585 F.Supp. 1579, 1581 (E.D.Mich.1984) (state employees not limited to actual costs of legal services to state).

In light of *Blum,* plaintiffs' contention that only prevailing plaintiffs ought to be compensated at the market rate because the purpose of § 1988 and other similar

---

**26.** At the outset, the predicate for plaintiffs' argument is quite incorrect for defendant's counsel were not awarded fees based on the prevailing market rate. Had they been, both counsel would have received at least $125.00 per hour.

*See Spell v. McDaniel,* 616 F.Supp. at 1105. However, the government drastically reduced its award request believing itself bound by the $75 per hour EAJA cap. *Harris v. Marsh,* 679 F.Supp. at 1332–33 n. 208.

fee-shifting statutes is to encourage the retention of competent private counsel to act as public attorneys-general in civil rights cases falls of its own weight. *Blum* dealt with a non-profit legal aid organization. Just as with the government, plaintiffs' counsel in *Blum* were salaried employees, unconcerned with billing rates. There, as here, counsel were never at a loss for cases, that is to say, unlike the private Bar, fees had nothing to do with whether Stenson's attorneys accepted her case or not. If Stenson were not a client, another would take her place. Why government counsel, who work on the same basis, should be treated any differently than Stenson's counsel, plaintiffs are simply unable to credibly articulate.

Furthermore, the language used in § 1988 and interpreted in *Blum*, "a reasonable attorney's fee," is likewise found in 28 U.S.C. § 1927 (counsel liable for "attorney's fees reasonably incurred") and Rule 11 (counsel may be ordered to pay moving party "the amount of reasonable expenses incurred ... including a reasonable attorney's fee"). Why the term "reasonable fee" should be interpreted to mean market rate under one statute—§ 1988—a statute applicable not only to prevailing plaintiffs, but also to prevailing defendants in frivolous cases, *including local and state governments, see Hughes v. Rowe*, 449 U.S. 5, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980), and something entirely different (hourly salary) under another statute, § 1927 (and Rule 11), is far from obvious.

In support of their motion, plaintiffs ostensibly rely, in part, on the case of *Bailey v. United States*, 260 F.Supp. 48, 55 (E.D. Va.1966) (awarding attorney's fees to the government in an indemnity action). Far from suggesting the use of an hourly rate, however, *Bailey* holds that "the most appropriate and only sensible method of fixing attorney's fees is to evaluate [the] same according to what private attorneys ... would deem to be reasonable." 260 F.Supp. at 55. The court then reduced that fee amount by 40% on grounds that the government is not a profit-making venture. *Id.* Although this court disagrees with Judge Hoffman's reduction in *Bailey*, it is

ironic that were the *Bailey* formula to be applied here, the prevailing market rates for Loewenberg and Berry would easily equal the $125.00 rate established for lead counsel in *Spell v. McDaniel*, 616 F.Supp. at 1105, and, thus, counsel at bar would be entitled to exactly what they earlier received and now request—$75 per hour ($125 × .60).

Finally, the court finds plaintiffs' "salary only" proposal unrealistic in terms of the actual costs expended by the government in defending litigation. Use of actual salary may be enticing because it is easily calculated, but it fails to achieve an equitable result. Under this simplistic formula, the government does not recoup its true costs of litigation which, like private counsel, include secretarial and support staff expenses, supplies, materials, travel, phone calls, etc. In this district the general rule is that overhead usually costs a private firm approximately 40% of its income. *See* Trans., Vol. April 1, 1988, at 37–38. There is not the slightest reason to believe the government operates any more efficiently than the private sector.

Accordingly, given this factual and legal setting, and the fact that counsel's rates are substantially less than the prevailing market rates, the court holds that defendant's fee request is patently reasonable. *See Altschuler v. Samsonite Corp.*, 109 F.R.D. 353, 357–58 and n. 4 (E.D.N.Y.1986) (assessing fees against plaintiffs for services of third-party defendant federal government's counsel pursuant to a Rule 37 motion at the rate of $75 per hour, using market rates); *Doyle v. United States*, 817 F.2d 1235 (5th Cir.1987) (similar holding under Rule 11). Defendant is therefore entitled to an additional pre-mitigation award of $23,014.50.

Notwithstanding this determination, because deterrence—not full compensation for defendant, *see Brown v. Federation of State Medical Boards*, 830 F.2d at 1439—is the primary goal of the sanctions issued at bar, the court finds assessment of the entire sum above unnecessary for and incompatible with adequate deterrence.

*See Ordower v. Feldman,* 826 F.2d 1569, 1575–76 (7th Cir.1987); *Cabell v. Petty,* 810 F.2d 463, 466 (4th Cir.1987). Therefore, the court reduces defendant's additional award to $10,000.00, to be assessed in the following manner:

(1) Plaintiff Sandra Blue is ORDERED to pay $3,000 in additional attorney's fees to defendant;

(2) Julius Chambers is ORDERED to pay $4,000 in additional attorney's fees to defendant;

(3) Geraldine Sumter is ORDERED to pay $3,000 in additional attorney's fees to defendant; and

(4) Gilda Glazer is not assessed with any further sanctions in this matter.

As in the primary opinion of this court, to the extent Ferguson, Stein, Watt, Wallas & Adams wishes to cover three quarters (³⁄₄) of the additional sanctions assessed against either lawyer, it may do so. However, one-quarter (¼) must be paid by the lawyers individually and the entire amount by Blue within thirty (30) days of the date of service of this order absent a stay of its terms. No monies may or shall be paid by the NAACP or the LDF.

## VII. *Miscellaneous Sua Sponte Matters*

 Although not the subject of any motion, several recent Supreme Court and lower federal court cases require brief comment. First, with respect to plaintiff Beulah Mae Harris' argument that dismissal of her claims with prejudice under Rule 41 precludes any imposition of fees and costs against her or counsel, the court cites the parties to *Szabo Food Services, Inc. v. Canteen Corp.,* 823 F.2d 1073, 1076–79 (7th Cir.1987), *cert. dismissed,* — U.S. ——, 108 S.Ct. 1101, 99 L.Ed.2d 229 (1988). In that case, plaintiff dismissed its complaint under Rule 41(a)(1)(ii) and, after defendant moved for Rule 11 sanctions, subsequently argued the dismissal deprived the district court of "jurisdiction" to award fees against it. *Id.* at 1076. Reversing the district court's decision not to impose fees,

a unanimous (in relevant part) panel of the Seventh Circuit held that plaintiff's dismissal did *not* deprive the district court of jurisdiction to award fees under Fed.R.Civ. P. 11. Writing for the court, Judge Easterbrook stated that a "court has jurisdiction to determine its jurisdiction and therefore may engage in all the usual judicial acts, even though it had no power to decide the case on the merits. It may supervise discovery, hold a trial, and order the payment of costs at the end." *Id.* at 1078.

In addition, the court held that awards of fees in any contest are collateral proceedings to the main dispute. *Id.* Thus, even though the district court loses its power to decide the merits of a case, it does not, *ipso facto,* also lose the power to award fees that may be in order as a result of what occurred prior to final disposition of the case on the merits. *Id.*

Finally, the court likened plaintiff's argument in that case, as here, to the following analogies:

> Suppose the plaintiff files suit and pays the filing fee with a rubber check, then orders a transcript of some preliminary proceedings (such as the hearing on a TRO in this case), and dismisses under Rule 41(a)(1)(i). Does the plaintiff avoid paying the docket fee and the court reporter on the ground that "[i]t is as if the suit had never been brought"? Neither filing fees nor reporters need be paid when suit is never filed, yet the plaintiff must pay up nonetheless. Suppose the plaintiff files a suit, seeks a TRO, in the midst of the hearing asks to approach the bench, emits a Bronx cheer, punches the judge in the nose, and as the judge reaches for a handkerchief to stanch the bleeding tenders a dismissal under Rule 41(a)(1)(i). In reply to the inevitable citation for contempt of court, the plaintiff could not say: "I wasn't there in the eye (nose?) of the law; nothing happened for which I am responsible; for 'it is as if the suit had never been brought'."

823 F.2d at 1078–79. With Judge Easterbrook's cogent and vivid analysis, this

court is in complete agreement.[27]

Second, in the interim between the court's December, 1987, Opinion and this order, the Supreme Court has decided the question of what evidentiary standards govern excessive subjectivity claims, such as those raised by Sandra Blue. In *Watson v. Fort Worth Bank & Trust,* —— U.S. ——, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), the Court determined that subjective or discretionary employment practices challenged as violating Title VII may, in appropriate cases, be analyzed under disparate impact analysis as well as disparate treatment. The holding of the Supreme Court therefore affirms essentially the same determination issued by this court in its prior opinion. 679 F.Supp. at 1299–1305. *See also Atonio v. Wards Cove Packing Co.,* 810 F.2d 1477 (9th Cir.1987) (*en banc*); *Griffin v. Carlin,* 755 F.2d 1516, 1522–25 (11th Cir.1985). Indeed, not only does this court's prior analysis comport with the plurality opinion in *Watson* but it also easily withstands scrutiny under the concurring opinion of Justice Blackmun. Thus, *Watson* portends no change in either analysis or result in this case.

Finally, although recent circuit authority has raised some question as to whether a litigant has a continuing obligation under Rule 11 to update, correct, or withdraw a once-valid document, including a complaint or answer, if it later learns there is no reasonable basis for the assertions contained therein, *see, e.g., Thomas v. Capital Security Services, Inc., supra,* this court continues to believe the obligation exists. *See Harris v. Marsh,* 679 F.Supp. at 1387. Claims cannot be pressed to trial once it has become clear from discovery that they are baseless. *See City of Yonkers v. Otis Elevator Company,* 844 F.2d 42, 49 (2d Cir.1988); *FlipSide Productions, Inc. v. JAM Productions, Ltd.,* 843 F.2d 1024, 1036–37 (7th Cir.1988). *Fahrenz v. The Meadow Farm Partnership,* 850 F.2d 207 (4th Cir.1988).

However, even if no continuing obligation exists under Rule 11, § 1927 inherently contains a continuing obligation to review the status of litigation. *See Fahrenz, supra* at 210 n. 1. Negligent pursuit of baseless claims obviously falls within the ambit of § 1927. *Id.* In addition, even assuming Rule 11 is "snapshot" oriented, focusing solely on the instant the document is signed, Rule 11 is implicated again as soon as a new series of papers is filed. Thus, if discovery establishes a plaintiff's claim is hopeless, although plaintiff need not, under the no-continuing-duty line of cases, revise or withdraw his complaint, he may not thereafter pursue the claim via further filings. If he does, Rule 11 is violated. *Gaiardo v. Ethyl Corp.,* 835 F.2d 479, 484 (3d Cir.1987); *Pantry Queen Foods v. Lifschultz Fast Freight,* 809 F.2d 451, 454 (7th Cir.1987). A review of this case leads to the inexorable conclusion that Rule 11 was violated with each and every filing of the plaintiffs relevant to the Blue and Harris claims from (and including) the Pre–Trial Orders forward (if not considerably before that date).

## VIII. *Closing Comment*

Today concludes, at least at this level, a disappointing chapter in the history of American litigation. Pursuit of this seriously flawed and meritless case was a disservice to its purported objective—the eradication of racial discrimination in the workplace. The egregious conduct of the case has eroded confidence in our judicial system. *This* court's personal disappointment is inconsequential. But the erosion of confidence of the court, as an institution, is a serious matter for both the Bench and Bar. No litigant, no lawyer and no cause warrants a lack of integrity in the presentation of a case, for such lack is corrosive to the court as an institution responsible for the dispensation of justice. Just as civility breeds civility, so does integrity breed integrity, and all who participate in our judicial system must exemplify such qualities. One has only to review the transcript of trial and record at bar, notwithstanding their sterility, to perceive the predicate for

---

**27.** The discussion in *Szabo* is not limited to dismissals under Rule 41(a)(1). Rather, *Szabo* applies with equal force to dispositions under Rule 41(a)(2), even those with prejudice.

**230**

the court's disappointment and the necessity for its orders entered herein.

SO ORDERED.

